John BRIGHT, Appellant,

v.

STATE of Alaska, Appellee.

No. A–4670.

Court of Appeals of Alaska.

June 10, 1994.

Gordon G. Goodman, Robinson, Beiswenger, & Ehrhardt, Soldotna, for appellant.

W.H. Hawley, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before: COATS and MANNHEIMER, JJ., and WOLVERTON, District Court Judge.*

*OPINION*

MANNHEIMER, Judge.

John Bright appeals his conviction for first-degree assault, AS 11.41.200(a)(1). He contends that the grand jury heard insuffi-

---

* Sitting by assignment of the chief justice made pursuant to Article IV, Section 16 of the Alaska Constitution.

cient evidence to support his indictment, that he was not brought to trial within the time limits of Alaska Criminal Rule 45, and that he was denied his right to a public trial because his trial was held in a prison (the Spring Creek Correctional Center in Seward). We uphold Bright's indictment, and we conclude that he was brought to trial within the time limits of Rule 45, but we conclude that the superior court's decision to hold Bright's trial in the Spring Creek prison violated Bright's right to a public trial. We therefore reverse Bright's conviction and remand this case for a new trial.

▪ Bright is an inmate at the Spring Creek Correctional Center near Seward. He was indicted for assaulting a fellow inmate at the prison. The victim of Bright's assault testified at grand jury that Bright threw a caustic liquid into his eyes, then hit him on the side of his head with a heavy object, shattering his skull. As the victim tried to escape from the room, Bright caught him and choked him until he lost consciousness. As a consequence of this attack, the victim suffered long-term damage to his eyes and severe facial injuries (fractures of the jaw and the orbit of the eye).

Based on this testimony, the grand jury indicted Bright for first-degree assault under AS 11.41.200(a)(1), "recklessly caus[ing] serious physical injury to another by means of a dangerous instrument". Bright asserts that the grand jury evidence failed to establish that Bright had used a dangerous instrument, and that the evidence likewise failed to establish that Bright had inflicted serious physical injury. We reject Bright's arguments.

Under AS 11.81.900(b)(11), a "dangerous instrument" is "anything that, under the circumstances in which it is used, ... is capable of causing death or serious physical injury".

The victim of Bright's assault testified that Bright struck him with "a chunk of metal or something". An ophthalmologist testified that the victim's injuries appeared to have been caused by repeated blows from a blunt object. The ophthalmologist also testified that the liquid Bright threw into his victim's eyes was "high[ly] alkaline". Under the circumstances of this case, the grand jury could properly find that both the blunt object and the caustic liquid were "dangerous instruments" within the statutory definition. See *Wettanen v. State*, 656 P.2d 1213, 1217–18 (Alaska App.1983) (whether an object is a "dangerous instrument" depends on whether it is "used in such a way as to be capable of causing death or serious physical injury").

Under AS 11.81.900(b)(51), "serious physical injury" includes "physical injury that causes serious and protracted disfigurement, protracted impairment of health, [or] protracted loss or impairment of the function of a body member or organ". The grand jury could properly find that the injuries to the victim's eyes and skull were "serious physical injuries" within this statutory definition.

▪ For these reasons, we uphold the grand jury indictment. We now turn to Bright's contention that he was denied his right to a speedy trial under Criminal Rule 45.

Because of his attack on a fellow inmate, Bright was placed in administrative segregation on October 18, 1991. The superior court (employing the 1991 version of Criminal Rule 45(c)(1)), ruled that the time for bringing Bright to trial began running 15 days later, on November 2, 1991.[1]

On January 17, 1992 (the 76th day), Bright filed a motion to dismiss his indictment. The superior court denied this motion 34 days later, on February 20, 1992. Bright concedes that this 34 days is properly excluded

---

1. In 1991, the pertinent portion of Criminal Rule 45(c)(1) stated that, when a prison inmate committed a crime, the time for bringing the defendant to trial commenced running "15 days from the time action [was] instituted in the correctional facility to impose administrative segregation" on the defendant. Criminal Rule 45(c) was amended effective July 15, 1993; a prisoner's placement in administrative segregation no longer triggers the rule. See Rule 45(c)(4).

In his brief to this court, Bright argues—without citing any authority—that administrative segregation is the equivalent of an "arrest" for a prison inmate, that Bright was therefore "arrested" when he was placed in segregation on October 18, 1991, and that the Rule 45 clock began to run on that day. The supreme court explicitly rejected this argument in *Aldridge v. State*, 602 P.2d 798, 800–01 (Alaska 1979).

from the Rule 45 calculation. *See* Rule 45(d)(1). Thus, February 21, 1992 was the 77th day for purposes of calculating the time for bringing Bright to trial under Rule 45.

On that day (February 21), Bright filed a pleading that he styled a "motion in limine".[2] In this pleading, Bright sought to have the site of his trial moved from the Spring Creek Correctional Center to the Seward courthouse.[3] Bright also asked the superior court to decide whether Bright would be restrained during his trial, whether the State would be allowed to present certain evidence at trial, and whether Bright would be allowed to impeach the State's witnesses with certain other evidence.

The superior court denied the site-of-trial portion of Bright's motion on March 6, 1992. Contemporaneously, the superior court ruled that the 14 days between the filing of Bright's motion and the court's decision would be excluded from the Rule 45 calculation. Thus, under the trial court's calculation, March 7, 1992 was the 78th day for Rule 45 purposes, and Bright's trial had to be held on or before April 18, 1992 (the 120th day). Bright's trial began on April 13, 1992.

On appeal, Bright argues that the superior court should not have excluded the 14 days between February 21 and March 6 from the Rule 45 calculation. Bright contends that none of the issues raised in his "motion in limine" needed to be decided before trial, that he could have waited until the first day of trial to raise all of these issues, and that his pre-trial filing of these motions was merely an act of courtesy for which he should not be penalized.

We reject Bright's characterization of his pleading. Bright's "motion in limine" included, among other things, a request for a change in the site of his trial. Such a motion, as a practical matter, had to be raised before the jury was empaneled. If Bright had waited until the first scheduled day of

trial to raise this motion, the trial would have been delayed while the superior court deliberated on the motion, and this delay would have been chargeable to Bright under Criminal Rule 45(d)(1). We see no reason why Bright's filing the motion before trial should change this result.

Moreover, both the supreme court and this court have consistently interpreted Rule 45(d)(1) in a literal manner: the running of the Rule 45 clock is tolled by any proceeding involving the defendant, whether or not it leads to ascertainable delay. *See State v. Clouatre,* 516 P.2d 1189, 1190–91 (Alaska 1973); *State v. Angaiak,* 847 P.2d 1068, 1072–73 (Alaska App.1993). Regardless of the name Bright gave his motion, that motion called upon the superior court to make several discretionary rulings before Bright's trial started. Under Rule 45(d)(1), Bright's motion tolled the running of Rule 45 until the superior court decided where the trial would be held. We therefore hold that Bright's trial date of April 13, 1992 was within the limits of Criminal Rule 45. (The facts of this case do not require us to decide whether Rule 45 could potentially have remained tolled while the superior court decided the remainder of the issues Bright raised.)

■ We now address Bright's final point on appeal: that his trial should have been held at the Seward courthouse, not the Spring Creek Correctional Center. The issue of whether Bright's trial should be held in the prison was first raised by the prosecutor at the omnibus hearing on January 23, 1992. Bright's attorney and the attorney representing Bright's co-defendant both stated that they intended to subpoena several Spring Creek inmates to testify at trial; they asked the court for some assurance that these witnesses would be allowed to testify in person rather than telephonically. The prosecutor then suggested, "as a possible alternative", that the trial be held at the prison. The prosecutor declared that the prison had

---

**2.** Neither the Alaska Criminal Rules nor the Alaska Civil Rules contain any reference to a "motion in limine". The term is generally defined as any "written motion[,] usually made before or [during] a jury trial[,] for a protective order against prejudicial questions and statements". *Black's Law Dictionary* (5th ed.1979), p. 914.

**3.** As explained in more detail below, the superior court had ruled on January 30, 1992 that Bright's trial should be held at the Spring Creek prison rather than in the Seward courthouse.

"far better facilities ... in terms of space" than the Seward courtroom, and she argued that all security problems would be cured by holding the trial in the prison. Bright's co-defendant's attorney immediately objected "strenuously" to holding the trial in prison. Superior Court Judge Charles A. Cranston told the parties that he would not rule on the prosecutor's suggestion until the extent of the prisoner-witness problem was clarified.

The next hearing in Bright's case took place on January 30, 1992. During that hearing, Bright's attorney told the court that he had subpoenaed various Spring Creek prisoners, but that prison authorities had declared that the subpoenas, by themselves, were insufficient to procure these witnesses' attendance at trial—the prison authorities would also need transport orders signed by the court. The prosecutor then again suggested that the trial be held at Spring Creek:

> PROSECUTOR: Your Honor, ... there are a lot of security [concerns] that need to be taken into account by the court in making such a decision. Spring Creek Correctional Facility ... is a maximum-security facility.... [T]he people out there are not the kind of people that you can just haul around in a station wagon en masse. The defense wishes ... to have them present for trial. I think that this just goes to the fact (indiscernible) request the trial in this matter should be held at Spring Creek Correctional Facility. The inmates are all available there. There's no transport issue. And, more importantly, there's no security issue. Clearly, a trial anywhere but Spring Creek presents a security issue, and, given the nature of the security issue, I think the trial should take place at Spring Creek, and certainly no further away than Seward.

> BRIGHT'S ATTORNEY: I believe trial is [already] calendared in Seward, Your Honor.

> ....

> THE COURT: [A]bsent further order of the court, the case will take place in the court facility in Seward rather than [in] the correctional facility. If there are motions relative to transport of witnesses or anything, I'll have to deal with those [later].

However, later that same day, Judge Cranston reversed himself in a one-sentence written order: "Upon further reconsideration by the Court[,] it is ordered that [t]he jury trial in [this] matter ... will be held in the Spring Creek Correctional Center and not the Seward Courthouse as previously announced."

On February 21, Bright filed his "motion in limine", which, among other things, asked the court to hold the trial at the courthouse rather than the prison. Bright noted that the court had issued its written order "without allowing defense counsel the opportunity to present any argument". Bright argued that the searches and screening of visitors normally conducted by prison authorities, as well as the general atmosphere of the prison itself, would be "coercive" to jurors and those members of the public wishing to attend the trial. Bright also argued that the constantly visible security measures at the prison would create or reinforce the jurors' perception that Bright was a dangerous criminal. For these reasons, Bright argued that holding his trial at the prison would violate the guarantee of public trial contained in Article I, Section 11 of the Alaska Constitution.

The State urged the court to maintain the trial site at Spring Creek because "the defendants ... are dangerous [and] many of the potential witnesses are also prisoners ... housed at the Spring Creek facility". The State argued that holding the trial at the prison would eliminate "[t]he burden and expense of transporting the defendants and all of the proposed prisoner witnesses" as well as "the danger that prisoners might escape". The State suggested, however, that Judge Cranston "should list all of [his] reasons for conducting the trial at Spring Creek" "to make certain that the record is clear".

On March 5, 1992, Judge Cranston denied Bright's request to move the trial back to the Seward courthouse. Acting upon the State's suggestion, Judge Cranston issued detailed findings supporting his decision to hold the trial at the prison:

> [1]. Courtroom facilities at the Seward Courthouse are not suitable for trying a case with an "in-custody" defendant. The problem is [exacerbated] in this case be-

cause there are two defendants, each of which poses a substantial security risk.

[2]. The only holding cells in Seward are located on the first floor of the City/State Building. The courtroom is on the second floor [of this building]. It is impossible to transport "in-custody" defendants to the second floor without doing so in front of the jury. In this case the defense intends to call ten or more inmates of [the Spring Creek Correctional Center] as defense witnesses. The Seward Jail has two cells available to house male inmates. Department of Corrections policies prohibit housing two convicted felons in the same cell in a facility such as Seward's. This means that there are no holding facilities available for potential witnesses. [D]efense witnesses must be transported one at a time from [Spring Creek]. This, by necessity, means that there will be a one- to two-hour time lag between defense witnesses.

[3]. Since all inmate witnesses from [Spring Creek] constitute security risks they will, by necessity, have to appear in noticeable restraints.

[4]. Under the circumstances[,] requiring the defense to present their witnesses in this fashion is more prejudicial to the defendants than holding the trial at [Spring Creek].

[5]. Assuming the trial were held in the Seward Courthouse[,] the defendants would be seated approximately ten feet in front of the first row of jurors. Those jurors would be sitting in ordinary chairs with nothing between them and the defendants except counsel tables. Witnesses, including inmate witnesses, would be closer still—approximately four feet. These circumstances would constitute an extreme security risk and likely raise "juror apprehension" beyond what it would be at the secure Spring Creek setting.

[6]. Realistic "bench conferences" are impossible in Seward unless the table exhibits are normally kept on is removed from the courtroom. "Chambers conferences" are possible but tedious—requiring security personnel to move through the courtroom with the defendants.

[7]. It is not possible to send the jury to the "jury room" and conduct court out of the presence of the jury in Seward. Conversations in the courtroom made in a "normal" tone of voice can be easily overheard in the jury room.

[8]. This alleged assault took place at [Spring Creek] and involves [Spring Creek] inmates. The jury will be aware of these facts no matter where the case is tried.

[9]. Virtually everyone in Seward is familiar with [Spring Creek] and view[s] it as a local industry. Most people know one or more individuals employed there. Thus, the [potential prejudice] of holding a felony trial inside a correctional institution is not nearly as great in Seward as it might be elsewhere.

Bright's trial began on April 13, 1992. Bright wore civilian clothing. Before voir dire of the jury began, Judge Cranston explained to the prospective jurors that the case was being tried at Spring Creek due to "many factors". Judge Cranston instructed the prospective jurors not to draw any inference concerning the guilt of either Bright or his co-defendant from the fact that the trial was being held at the prison.

During voir dire, several prospective jurors indicated that they were uncomfortable at Spring Creek and that they believed the trial should not be held at that location. After hearing the reactions of these jurors to the prison setting, Bright renewed his motion to change the trial site. This motion was denied.

After jury selection was completed, Judge Cranston told the surplus jurors that the trial was public and that they were free to remain in the prison to attend the trial.

As trial progressed to the summation stage, Bright requested that closing argument be held in the Seward courthouse and that the jury be allowed to deliberate in the courthouse. Judge Cranston granted the request. The jury subsequently hung on the charge against Bright.

Shortly before Bright's second trial, Bright requested that the trial be held at a place other than Spring Creek because the jurors

from the first trial had felt uncomfortable at the facility. Judge Cranston denied Bright's request, and the second trial began on July 14, 1992 at Spring Creek. Bright again wore civilian clothing, and Judge Cranston again explained to the prospective jurors that the case was being tried at Spring Creek for "many reasons", one of them being that most of the witnesses were inmates at the prison. The court again told the prospective jurors not to infer anything concerning Bright's guilt from the location of the trial. And, following jury selection, the court again invited the surplus jurors to remain and hear the rest of the case.

Near the conclusion of trial, Judge Cranston indicated he would be willing to hold final argument and jury deliberations at the Seward courthouse. Bright asked to have final argument at the prison, given the conditions under which he would be transported to the courthouse. Thus, the parties' summations were delivered at Spring Creek; however, the jury deliberated and announced its verdict at the Seward Courthouse.

On appeal, Bright challenges the superior court's decision to hold his trial at the Spring Creek prison. The State urges us to find that Bright failed to preserve this issue in the trial court. We reject the State's contention. As can be seen from the recitation of the procedural history of the case, Bright objected both to the way in which Judge Cranston reached his decision and to the merits of that decision. We therefore address the merits of the superior court's decision to hold Bright's trial in the prison.

For a thousand years, Anglo–American law has embodied the doctrine that trials should be open to the public. The history of this precept is chronicled in Chief Justice Burger's opinion in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), and in this court's opinion in *Renkel v. State*, 807 P.2d 1087 (Alaska App.1991). Both the Sixth Amendment to the United States Constitution (made applicable to the states by the Fourteenth Amendment) and Article I, Section 11 of the Alaska Constitution guarantee criminal defendants a public trial. And, while the Sixth Amendment guarantees only a defendant's

personal right to a public trial, *Gannett Co. v. DePasquale*, 443 U.S. 368, 379–80, 99 S.Ct. 2898, 2905, 61 L.Ed.2d 608 (1979), society also has a protected right, conferred by the First and Fourteenth Amendments, to attend and obtain information about criminal trials. *Richmond Newspapers*, 448 U.S. at 580, 100 S.Ct. at 2829 (main opinion), 448 U.S. at 581–82, 100 S.Ct. at 2830 (White, J., concurring), 448 U.S. at 584, 100 S.Ct. at 2831 (Stevens, J., concurring), 448 U.S. at 584–85, 100 S.Ct. at 2831 (Brennan and Marshall, JJ., concurring), 448 U.S. at 604, 100 S.Ct. at 2842 (Blackmun, J., concurring).

The guarantee of public trials has been said to foster and preserve at least three important societal values. Two of these primarily protect a defendant's right to a fair trial, while the third involves society's broader interest in preserving social cohesion and the public peace by allowing citizens to assure themselves that justice is being done.

First, constant public scrutiny motivates judges, prosecutors, jurors, and witnesses to adhere more strictly to their oaths of public duty. "[P]ublicity serves as a safeguard against unjust persecution of an accused and goes far toward insuring him the fair trial to which he is entitled." *People v. Jelke*, 308 N.Y. 56, 123 N.E.2d 769, 771 (1954). The possibility of comment and criticism by an informed public has the power to restrain whatever tendencies judges, prosecutors, and jurors might feel to indulge their emotions, their political agendas, or their self-interest to the detriment of their oaths and public trusts. *See In re Oliver*, 333 U.S. 257, 270 & n. 25, 68 S.Ct. 499, 506 & n. 25, 92 L.Ed. 682 (1948). And witnesses are more likely to tell the unembroidered truth when they know that their testimony is exposed to public scrutiny. *See Jelke*, 123 N.E.2d at 772; *Wigmore on Evidence* (Chadbourn rev'n 1976), § 1834, Vol. 6, pp. 435–36.

Second, public observation and reporting of trial testimony will, from time to time, enhance the truth-finding process by creating the possibility that someone who attends the trial or who learns of the testimony through the media may be able to furnish additional evidence, either to further elucidate the events being litigated or to contra-

dict the testimony of previous witnesses. Wigmore quotes an example in which media dissemination of trial testimony prompted an important corroborating witness to come forward. *Wigmore,* § 1834, Vol. 6, p. 437–38.[4]

An instance in which media coverage of an Alaska trial prompted an impeaching witness to come forward was described in *Cheely v. State,* 861 P.2d 1168, 1172 (Alaska App.1993): a high school counselor who was acquainted with one of the witnesses was "stunned" when he read a newspaper account of that witness's testimony; believing that the witness had committed perjury, the counselor came forward to offer his own competing testimony. Professor Wigmore gives other examples of similar occurrences; *Wigmore on Evidence,* § 1834, Vol. 6, p. 436 & n. 2.

The third value derived from the public trial guarantee is its beneficial effect on our democratic institutions. Public observation of criminal justice proceedings fosters public acceptance of the criminal justice system. If citizens are able to observe that justice is being dispensed fairly and even-handedly, then the citizenry will support or at least accept the decisions of the courts. Social tranquility often depends on the public's willingness to accept the verdict in a debatable or emotion-laden criminal case rather than turning to extralegal avenues for expressing community outrage, frustration, or desire for retribution. If the people are denied access to the criminal justice process, they may well lose faith in its results. As the Supreme Court said in *Richmond Newspapers,*

People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing. When a criminal trial is conducted in the open, there is at least an opportunity both for understanding the system in general and its workings in a particular case[.]

448 U.S. at 572, 100 S.Ct. at 2825.

[W]here the trial has been concealed from public view[,] an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted. To work effectively, it is important that society's criminal process satisfy the appearance [as well as the fact] of justice.

448 U.S. at 571, 100 S.Ct. at 2824.

■ Notwithstanding these constitutional interests of both the defendant and the public, judges have the authority to restrict the access of some or all members of the public to some or all portions of criminal trials. "The public trial concept has ... never been viewed as imposing a rigid, inflexible straitjacket on the courts. It has uniformly been held to be subject to the inherent power of the court to preserve order and decorum in the courtroom, to protect the rights of parties and witnesses, and generally to further the administration of justice." *People v. Jelke,* 123 N.E.2d at 772. However, this judicial power to restrict or deny public access to court proceedings may be exercised only when unusual circumstances imperil a more important societal value, and then only

---

4. A woman was on trial for murdering her husband. She took the stand in her own defense and testified that her husband had repeatedly subjected her to brutality and had often threatened to kill her. In particular, the defendant "described with great care and particularity a scene that had occurred ... about two years earlier in Nagasaki, Japan, where [she and her husband] had had one of these quarrels in the course of which, in a loud voice, he had threatened to kill her". The defense attorney continues the account:

The daily papers had quite full accounts of this testimony. On the evening those accounts appeared[,] I was eating dinner ... when I was called to the telephone, and a very genteel voice inquired if I was the lawyer for the defendant in this murder case[.] When I said that I was, the lady on the phone said she had read in the New York "Evening Post" the

defendant's account of the Nagasaki incident; that she was the wife of a naval officer and had happened ... to be in the hotel in Nagasaki on the evening when the quarrel occurred; and that as her room adjoined that in which the quarrel was taking place, and the partitions were very thin, she could hear, and had plainly heard, the man threaten to kill his wife, and she felt she ought to bring this to my attention. I asked her if she would come out and testify, and she volunteered to do so....

Her evidence, given in a resolute and convincing manner, was very damaging to the State and helpful to the accused. She was vigorously cross-examined ... but her story remained unbroken, and I always felt that it had great weight in bringing the acquittal that followed[.]

*Wigmore,* § 1834, Vol. 6, p. 438.

when alternative measures have been considered and found wanting.

> [S]ince the concept of a secret trial is anathema to the social and political philosophy which motivates our society, the discretion to limit the public nature of judicial proceedings is to be sparingly exercised and, then, only when unusual circumstances necessitate it.

*People v. Jones*, 47 N.Y.2d 409, 418 N.Y.S.2d 359, 391 N.E.2d 1335, 1338 (1979).

Does holding a trial inside a prison violate a defendant's right to a "public trial"? Perhaps on account of our strong tradition of holding trials in public courthouses, there are few published decisions on this question.

In *State v. Lane*, 60 Ohio St.2d 112, 14 O.O.3d 342, 397 N.E.2d 1338 (1979), the three defendants were prison inmates charged with escape. For "reasons of security and convenience", *id.*, 397 N.E.2d at 1339, the defendants' trials were held in an improvised courtroom within the maximum security prison. *Id.* at 1340. The Ohio Supreme Court ruled that holding the trials in prison necessarily violated the defendants' right to a public trial.

> We ... hold ... that such trials offend due process as being fundamentally unfair because of the inherent potential for prejudice arising [from having a prison as the site of the trial].... [S]uch a trial setting violates the spirit of neutrality which serves as a cornerstone to modern notions of due process. As has been aptly stated, "the courtroom in Anglo–American jurisprudence is more than a location with seats for a judge, jury, witnesses, [parties and their attorneys], and public observers; the setting that the courtroom provides is itself an important element in the constitutional conception of [a] trial, contributing a dignity essential to the integrity of the trial process."

*State v. Lane*, 397 N.E.2d at 1342–43, quoting *Estes v. Texas*, 381 U.S. 532, 561, 85 S.Ct. 1628, 1642, 14 L.Ed.2d 543 (1965).

In *Vescuso v. Commonwealth*, 5 Va.App. 59, 360 S.E.2d 547 (1987) (en banc), the defendants were likewise prison inmates charged with escape whose trials were held in a courtroom inside the prison. Parting company with the Ohio Supreme Court, the Virginia Court of Appeals did not flatly rule that any trial held in prison was a trial held in violation of the constitution. Rather, the Virginia court declared that extraordinary circumstances might justify moving a criminal trial from the traditional setting of a courthouse to a prison. *Id.*, 360 S.E.2d at 551. However, the court also ruled that the act of holding a criminal trial in a prison presumptively violates the defendant's right to a public trial, and that the state bears the burden of producing evidence to justify the transfer of the trial. *Id.*, 360 S.E.2d at 550. The court explained its decision this way:

> The practice of removing trials from the courthouse to a penitentiary, in the absence of any showing of overriding public necessity or justification, offends traditional notions of fairness and basic precepts of our criminal justice system. The public trial provisions of the [federal and state constitutions] envision that our trials will be held under circumstances which do not inhibit public attendance or freedom of access. We cannot think of any location within the Commonwealth that gives less freedom of access than ... a prison.... Furthermore, the character of a prison facility is fundamentally different from that of a courtroom at the public courthouse.

*Vescuso*, 360 S.E.2d at 551.

In *Vescuso*, the only explanation of the circumstances that ostensibly justified holding the defendants' trials in prison was a letter written by the trial judge in response to the defendants' motion to move the trials to the courthouse. The judge's letter contained what the court of appeals called "conclusory statements" in which the judge found that prison inmates were "no more reluctant to testify in a [prison] courtroom than [in] a courthouse courtroom", that jurors' apprehension about attending a trial inside a prison would not be "significantly greater than [the apprehension] experienced when [jurors are] called to serve at the courthouse", and that courthouse security would be "greatly

compromised when a county courthouse is swamped with vans carrying inmates from various [penal] institutions to be tried or to testify". *Id.*, 360 S.E.2d at 548–49.

The Virginia Court of Appeals found that the trial judge's statements were wholly inadequate to justify holding the defendants' trials in the prison:

> [T]he Commonwealth did not produce any evidence to show the necessity of transferring the [defendants' trials] from the Nottoway Courthouse to the correctional center. The letter of the trial judge is not evidence and[,] even if we consider the letter, no facts or circumstances are disclosed concerning the [defendants'] trials ... to justify [holding] their trial in a prison. At most, the letter contains general conclusions of the trial judge. There were no findings of fact specifically related to [the defendants,] and neither [defendant] was given an opportunity to present evidence regarding the justification for holding their trial in a prison.

*Vescuso*, 360 S.E.2d at 551.

> We do not mean to imply that a trial may never be transferred from the courthouse to a penitentiary. However, before the constitutional right of a defendant to a public trial can be jeopardized, the record must contain findings of fact showing some clear and present overriding public interest or justification.... [Moreover, when the trial court transfers a trial] from the courthouse to another location, the trial court must adopt and implement adequate measures [so that the transfer] will not unduly infringe upon the public trial guarantee and will assure freedom of access to the trial. Provision should be made for reasonable notice [regarding the change in trial site] to the parties and general population who have a right to expect the trial to be held at the courthouse[.] Furthermore, administrative convenience is insufficient, standing alone, to justify a transfer of a criminal trial from the courthouse.

*Vescuso*, 360 S.E.2d at 551.[5]

In a society that wishes to remain free, it is imperative "that justice ... not be done in a corner nor in any covert manner". *Richmond Newspapers*, 448 U.S. at 567, 100 S.Ct. at 2822 (quoting the 1677 Concessions and Agreements prescribing the governance of West New Jersey). By their nature, prisons are places where deeds can more easily be done out of the public eye. Not only is

---

5. Seven months later, in *Howard v. Commonwealth*, 6 Va.App. 132, 367 S.E.2d 527 (1988), the Virginia Court of Appeals upheld a trial judge's decision to hold a prison inmate's trial in a courtroom housed in an administrative building on prison grounds but approximately 40 yards outside the prison's front gate.

The defendant in *Howard* was charged with conspiring to murder another inmate. The trial judge found that normal security measures at the courthouse would not be adequate to provide for the twenty-two prison inmates who had been subpoenaed as witnesses. *Id.* at 529. Instead, the defendant's trial was moved to the administrative building, which, according to the record, was

> totally outside of the [prison] compound. The jurors [did] not have to come through any bars or any gates. There [were] no bars on any windows [or] on any doors.... The courtroom [was] set up with a Judge's bench, with counsel table, with chairs for witnesses, and a jury bench on an elevated dais. And in all respects it resemble[d] a courtroom.

*Howard*, 367 S.E.2d at 529.

Howard did not assert that this trial site violated his right to a public trial. He did, however, raise the related claim that holding his trial in the prison administrative building prejudiced him by creating an atmosphere that implicitly communicated his dangerousness and guilt to the jurors. The Virginia Court of Appeals concluded that "the trial location did not erode Howard's right to a presumption of innocence". *Id.*, 367 S.E.2d at 531.

> [T]he record before us shows that Howard was tried outside of the prison compound[,] in a courtroom that "in all respects resemble[d] a courtroom".... The jury did not have to pass through gates or other security devices to reach the courtroom. The courtroom itself was not of a makeshift character. Since Howard was being tried for the murder of another inmate, the jury necessarily had to know that he was an inmate of the Powhatan Correctional Center. We find that the jury could reasonably have concluded that Howard's trial was being conducted in the administrative building for reasons of efficiency and convenience[, inasmuch as] [m]any of the witnesses at the trial either worked at or were incarcerated in the adjacent [Correctional] Center. Therefore, we conclude that the location of Howard's trial did not impermissibly suggest that he was guilty ... or otherwise operate to inherently prejudice him.

*Howard*, 367 S.E.2d at 531–32.

access to prisons restricted, but prisons are perfused with physical manifestations of the coercive power of the state. Many citizens who would otherwise attend a trial might not willingly enter a prison. Jurors might find themselves unable to set aside the constant reminder of the dangerousness of any defendant incarcerated there. In trials with political overtones, jurors and spectators alike might be intimidated by the prison's implicit message that similar treatment awaits those who thwart the government. These intangible factors insidiously undermine the values supported by the guarantee of a public trial. And these factors are at their strongest within the walls of maximum security prisons such as Spring Creek.

■ Like the Virginia Court of Appeals, we are unwilling to flatly declare that the Alaska Constitution prohibits holding a criminal trial in a prison under any and all circumstances. However, any decision to hold a trial in a prison must be subjected to the strictest scrutiny, and that decision must be supported by compelling reasons.

We initially note that, from the record in this case, it is debatable whether Bright's trial was open to the public. The record does show that, when jury selection was completed, Judge Cranston invited the extra venire persons to stay and observe the trial. And it appears that a friend or colleague of one of the defense attorneys attended the trial. But the venire persons were summoned to the trial by court order, and prison officials were presumably instructed to let them enter. The defense attorney's friend presumably learned of the trial from the defense attorney and may well have entered the prison in the company of the attorney. There is nothing in the record to indicate that any measures were taken to make sure that interested persons who came to the Seward courthouse looking for Bright's trial would be directed to Spring Creek, nor is there any indication that these interested persons (or casual observers) would have been allowed entry to the prison.

Moreover, even assuming that the public was notified of the change in the trial site and that prison officials freely allowed members of the public to enter and observe the trial, we rule that the superior court's decision to hold Bright's trial in prison violated Bright's right to a public trial.

As described above, when Judge Cranston issued his written order moving Bright's trial to Spring Creek, there had been only perfunctory in-court discussion of the trial site. At the omnibus hearing, the prosecutor briefly mentioned the possibility of holding the trial at Spring Creek. One week later, at the pre-trial hearing on January 30, 1992, the prosecutor formally asked the court to move Bright's trial to the prison. The defendants objected, and Judge Cranston denied the State's request. The issue received only cursory consideration; Judge Cranston denied the State's motion without calling for a substantive response from the defendants.

Then, later that same day, without additional notice and without additional input from the parties, Judge Cranston issued a written decision moving the trial to the prison. The judge's decision was supported by a series of nine findings. These findings addressed several aspects of the Seward court facilities: the physical layout of the courtroom, the ease of holding bench conferences, the suitability of the sound insulation in the jury room, and the manner in which in-custody defendants and witnesses would be transported to the courtroom from the holding cells. In addition, Judge Cranston's findings addressed the physical capacity of the Seward jail and the Department of Corrections' rules respecting the housing of convicted felons in that jail. The judge's findings also included assessments of the Seward community's attitude toward the Spring Creek prison and of jurors' expected degree of apprehension at having to sit a few feet from convicted felons in the witness box if the trial was held in the courthouse.

Bright received no notice that Judge Cranston was considering any of these factors. Moreover, as Bright points out, most of the factors cited by Judge Cranston involve perceived inadequacies of the Seward court facility that would apparently apply with equal force to any criminal trial in which either a defendant or a witness is in custody. If these factors were sufficient to justify holding a trial in the prison rather than in the

courthouse, a great percentage of criminal trials could be moved from the courthouse. Such a result would be wholly inconsistent with the guarantee of a public trial and the societal goals it serves.

Equally important, the record contains neither testimony nor substantive discussion by the parties to support any of Judge Cranston's findings. Many of the judge's findings rest on debatable conclusions that were not the proper subject of judicial notice. *See* Alaska Evidence Rule 201(b). The judge's assertions about the Seward jail facilities and the Department of Corrections' rules governing them may be true, but these findings appear to have been gleaned either from the judge's personal knowledge obtained earlier in other contexts or from the judge's personal investigation in this case, an investigation whose results were not revealed to the parties until the judge issued his ruling. Further, the record discloses no basis for the judge's findings regarding community attitudes in Seward toward the Spring Creek prison.

We therefore conclude that the decision to move Bright's trial to the Spring Creek prison was an abuse of discretion in four respects. First, Bright's procedural rights were violated by the manner in which the superior court reached its decision. Bright was entitled to advance notice of the judge's proposed findings, and Bright was entitled to respond to those proposed findings—to test them in an adversary process—before the judge made his final decision on the question of the trial site. Second, there is little or nothing in the record to support the trial judge's findings. Because this issue was never litigated or even substantively discussed in open court, the record contains neither testimony nor attorneys' statements to provide an underpinning for the judge's conclusions of fact. Third, the trial judge's findings hinge primarily on factors that are not specific to Bright's case; rather, these findings address the difficulties of holding any trial in which a defendant or a witness is in custody. Instead of proving that Bright's case presented extraordinary circumstances, these factors point out generic problems in the design of court facilities. A great num-

ber of criminal trials involve defendants or witnesses who are in custody; the factors relied on by the trial judge in this case could theoretically justify holding all of these trials in prisons or jails—an unconstitutional result. And fourth, there is nothing in the record to indicate that the trial judge considered or investigated alternative measures that might have alleviated some of the perceived drawbacks of the Seward courthouse, so that trial could take place in the courtroom without undue security risk while at the same time preserving the order, decorum, and openness of the trial proceedings.

For all these reasons, we conclude that holding Bright's trial at the Spring Creek Correctional Center violated Bright's right to a public trial under the United States Constitution and the Alaska Constitution. When a defendant's right to a public trial has been unlawfully abridged, the defendant need not show prejudice. Rather, the result is automatic reversal. *Renkel v. State*, 807 P.2d at 1094. We therefore REVERSE the judgement of the superior court; Bright is entitled to a new trial.