887 So.2d 817 (2004)
Roy Randall HARPER, a/k/a Roy Randle Harper and John Fred Woolard, Appellants
v.
STATE of Mississippi, Appellee.
No. 2002-KA-01903-COA.
Court of Appeals of Mississippi.
June 22, 2004.
Rehearing Denied October 5, 2004.
Certiorari Denied December 2, 2004.
*819 Roy Randall Harper, Appellant, pro se.
David Clay Vanderburg, David L. Walker, Batesville, Attorneys for Appellants.
Office of the Attorney General by Billy L. Gore, Attorney for Appellee.
EN BANC.
GRIFFIS, J., for the Court.
¶ 1. Roy Randall Harper and John Fred Woolard were convicted on charges of burglary of a dwelling, grand larceny, and kidnapping by a Tallahatchie County Circuit Court jury.
¶ 2. On appeal, Harper and Woolard raise the following issues: (1) whether the trial court erred in moving the trial to Parchman; (2) whether the trial court erred in denying defendants' objection to the State's use of seven of its peremptory challenges against males; (3) whether the trial court erred in requiring Harper and Woolard to remain shackled and clothed in prison garb during their trial; and (4) whether the trial court erred in sentencing defendants as habitual offenders pursuant to Miss.Code Ann. § 99-19-83 (Rev.2000).
¶ 3. Woolard raises two additional issues: (1) whether the trial court erred in overruling his motion for a mistrial after the district attorney argued to the jury in closing arguments that the victims were *820 "good Christian people;" and (2) whether the trial court erred in denying his motion to abolish peremptory challenges.
¶ 4. Harper raises three additional issues: (1) whether the trial court erred in not responding to his motion for a psychological evaluation; (2) whether the trial court erred in ruling that testimony by Ronnie Collins, a Mississippi Department of Corrections (MDOC) employee, was not hearsay; and (3) whether he was provided ineffective assistance of counsel.
¶ 5. Finding no error, we affirm.

FACTS
¶ 6. Harper and Woolard escaped from the maximum security unit at the Mississippi State Penitentiary at Parchman. While unlawfully out of prison, they broke into the home of a Tallahatchie County couple, stole certain items from them, departed in the couple's vehicle, and left the couple bound with rope in their home. The victims remained bound for almost two days before they were discovered. Harper and Woolard were eventually captured in Indiana and were returned to Mississippi to serve the remainder of their previous sentences.
¶ 7. A Tallahatchie County jury convicted Harper and Woolard of burglary of a dwelling, two counts of grand larceny and two counts of kidnaping. Each was sentenced to serve a term of life imprisonment without the possibility of parole on each count, to run concurrently. The trial court ordered that the sentences for the two were to run consecutive to any and all other previously imposed sentences.

DISCUSSION

I. Whether the trial court erred in moving the trial to the Administration Building at Parchman.
¶ 8. The first day of trial the voir dire or jury selection process occurred at the Tallahatchie County Courthouse in Sumner. However, after spending one day at the Tallahatchie County Courthouse, the trial judge moved the remainder of the trial to a room in the Administration Building at Parchman Penitentiary, where Harper and Woolard were confined both before their escape and after their recapture.
¶ 9. The trial judge held a pre-trial hearing at which the appropriate level of security for the trial was discussed and considered. Security was a concern to the trial judge because of the age of and lack of security measures available at the Tallahatchie County Courthouse in Sumner. Indeed, the Tallahatchie County Courthouse in Sumner is an historical facility that does not have modern security protections.
¶ 10. Harper and Woolard each had a history of violent criminal convictions and lengthy incarcerations, together with several escapes from confinement. The trial judge questioned the Tallahatchie County Sheriff and Mississippi Department of Corrections's officials to determine the appropriate security measures that were necessary for the trial. Defense counsel and the district attorney were given the opportunity to call and question witnesses as well as comment upon and offer input or suggestions for the appropriate level of security.
¶ 11. Harper's and Woolard's criminal histories were an important consideration. In 1982, Harper was convicted of armed robbery and armed robbery with a firearm. He was sentenced to serve forty-four years on each count, with the sentences to run consecutively, for a total of eighty-eight years of incarceration. Harper had two prior convictions: in 1976, he was convicted of first degree burglary; *821 and in 1978, he was convicted of armed robbery. Both prior convictions were in Arizona.
¶ 12. In 1991, Woolard was convicted of murder and kidnapping. Woolard was sentenced as an habitual offender to a term of life in prison without the possibility of parole. Woolard had four prior convictions: in 1989, he was convicted of two counts of burglary and sentenced to fifteen years on each count; also in 1989, he was convicted of possession of cocaine, battery on a law enforcement officer, and escape, for which he was sentenced to serve three years and six months; in 1989, he was convicted of burglary and grand theft, and he was sentenced to a term of three years and six months; and in 1998, he was convicted of felony escape and was sentenced to five years.
¶ 13. The trial judge correctly sought information and guidance on the appropriate security that was necessary for the trial. The trial court was concerned with the safety of the trial participants and the public and concerned about the possibility that Harper and Woolard would once again attempt to escape. The district attorney advised the court that Harper and Woolard were habitual offenders, who escaped from the maximum security unit at Parchman where they were serving lengthy sentences, that they both were an escape risk, and that they both had "nothing to lose" by attempting another escape.
¶ 14. The MDOC officials agreed and advised the court that both defendants were "extremely high-risk" and that their body restraints should not be removed. One official said that Woolard had seven prior felonies and he advised the court that Harper had previously been quoted, in a newspaper interview, as saying that the conditions at Parchman were so bad that they just had to escape, and if necessary, they would kill someone so that they could be placed on death row to improve their living conditions. The MDOC officials were adamant that the defendants should remain shackled, chained and dressed in prison clothing or "garb."
¶ 15. The Sheriff and the MDOC officials indicated that the trial at the Tallahatchie County Courthouse that day required the attendance of approximately ten armed law enforcement officers.
¶ 16. More telling of the significance of the security risk, was the argument by Harper's counsel asking that the charges be dismissed. He told the court:
[S]ince both defendants are going to be in the penitentiary for the rest of their life [sic], one man serving 88 years, and I think it's a mandatory 88 years, the other one serving a life without parole, both men are incarcerated in the State Penitentiary for the rest of their life. I feel there is no reason to go ahead with these charges today. Why even take the risk of bringing these individuals up here to Tallahatchie County. Why put them at risk. Why put the citizens of Tallahatchie County at a risk if the State's not going to seek the death penalty, which they can't under these charges. Why even put  we have one, two  we've got four attorneys here we're tying up, we've got a Court Reporter, we've got four officials from MDOC, we've got four officers from the Sheriff's office and the Sheriff, we've got a Circuit Judge that we're going to tie up for two or three days and there's going to be no benefit to the State.... Why put Sumner and Tallahatchie County at any type of risk. Dismiss these charges and be done with this.
(emphasis added).
¶ 17. The essence of the security concerns was that because Harper and Woolard had nothing to lose, if they attempted *822 yet another escape, they posed a substantial escape risk during the course of their trial if it was held away from Parchman. Therefore, the reasonable, appropriate and necessary security protections could only be provided at Parchman.
¶ 18. Harper and Woolard objected to moving the trial. Woolard's counsel called Woolard to testify about the prejudice that he would incur. Woolard testified:
Well, it would result in a prejudicial setting, you know. Because the jury  it's a real small area, it's not even half the size of this courthouse here. And the fury would be surrounded by MDOC officials and it would look like  it would really look pretty bad, you know.
...
It's very  so close that they could even hear a whisper, you know, somebody whispering to the side. Because it's so cramped, you ain't really got any room for no jury in there.
Their counsel argued that the constitutional requirements of holding a public trial, of due process and of fundamental fairness dictated that the trial be held at the Tallahatchie County Courthouse in Sumner. After examining the record, there appears no evidence to indicate that Woolard's concerns occurred during the trial.
¶ 19. The trial judge decided that the constitution permitted the trial to be moved to Parchman, only when exceptional circumstances were present. The court changed the "physical site for the trial of the case purely for security purposes." The court reasoned "[t]his decision was made simply because looking at the background of these two individuals, and out of the presence of the jury, the allegations of the habitual status in this indictment [sic], [and] their being accused of committing these offenses while on escape status from the Mississippi Department of Corrections."
¶ 20. After jury selection, the jurors were instructed by the trial judge on security precautions that would be in place, including an admonition against bringing cell phones, a suggestion not to bring too much money, the requirement that they would need some form of identification at all times, and other similar considerations. Transportation for the jurors to Parchman was in a school bus.
¶ 21. In response to defense counsel concerns about whether such a proceeding could be considered an "open" trial within the meaning of the Sixth Amendment, the trial court offered to let the defendants prepare and submit a list of individuals they would like to be present at the trial. The trial judge would make arrangements to ensure that these people were admitted under the same precautions that would be in effect for admitting the jurors. The court further expressed the view that it saw no particular problem with the proposed procedure from a "fairness" standpoint since the proof was going to show that the defendants were penitentiary inmates who had escaped to go on the alleged crime spree and that actually seeing them in the prison setting would not improperly prejudice the defendants in the eyes of the jurors.
¶ 22. In response to concerns about the size of the room to be used for the proceeding, the prosecution responded that it had been assured by Parchman authorities that a closed circuit broadcast of the proceedings could be arranged in another room in the same building if necessary. The record does not indicate whether any person actually attended the trial, whether the closed-circuit television hook-up was actually put into place, or whether any person was denied access to the proceeding.
*823 ¶ 23. On appeal, Harper and Woolard argue that they were denied a public trial as required by the state and federal constitutions. The Sixth Amendment of the United States Constitution, in pertinent part, provides:
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed....
Article 3, Section 26 of the Mississippi Constitution, in pertinent part, provides:
In all criminal prosecutions the accused shall have a right to ... a speedy and public trial by an impartial jury of the county where the offense was committed....
Harper and Woolard concede that the trial jury was selected from the proper and appropriate district, but argue that the trial should be conducted in the "home county of the jury."
¶ 24. To support their argument, Harper and Woolard cite Mississippi Publishers Corp. v. Coleman, 515 So.2d 1163 (Miss.1987), for the propositions that (a) criminal processes should be open to public scrutiny and exception can be made for good cause; and (b) the right to a public trial belongs to the accused and no one else.
¶ 25. The State responds that Mississippi Publishers Corp. is not applicable. Indeed, the State contends that there is no evidence that the trial judge closed any of the trial proceedings to the press. The trial judge made arrangements to ensure that the public could attend the trial. The supreme court held in Mississippi Publishers Corp. that "criminal processes should be open to public scrutiny. Exceptions can be made, but only for good cause." Id. at 1165.
¶ 26. As quoted above, Mississippi Publishers Corp. stands for the proposition that there are certain extremely limited circumstances where a criminal trial may require certain restrictions on public scrutiny, and such restrictions may still pass constitutional muster. The supreme court cited the United States Supreme Court decision in Press-Enterprise Co. v. Superior Court of California, Riverside County, 464 U.S. 501, 509-510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), where the court reasoned
"[T]he circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one. Where ... the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest."
...
The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.
[citation omitted].
¶ 27. Here, the trial court determined that the security risk of two prisoners on trial for crimes they committed during a period of their escape from lawful incarceration, coupled with their violent criminal history, was sufficient to pose some limitations on the public trial. Nevertheless, the trial judge made sufficient arrangements to ensure that the public and the press could attend and observe the *824 proceedings. The trial judge's concerns were both reasonable and justified.
¶ 28. Other states have weighed in on the question of moving a trial from the place designated for such proceedings to a facility inside prison grounds, where the defendants are housed. Because these cases are in conflict and there is no consistent rule, a discussion of these cases is helpful.
¶ 29. In State v. Lane, 60 Ohio St.2d 112, 397 N.E.2d 1338 (1979), the Ohio Supreme Court considered the question of whether conducting a defendant's trial in prison violated that defendant's right to a public trial. Lane was charged with escape, and his trial was conducted inside the prison. Id. at 1341. However, the court did not expressly state the reasons Lane's trial was moved from the courthouse to the prison. The defendant planned to raise the defense of duress at trial, claiming the prison conditions were so reprehensible that he had no choice but to escape. Id. To properly raise this defense, inmates at the penitentiary would have to testify as to certain jail conditions. Id. at 1342. However, after learning the trial would be conducted at the prison, the inmates refused to testify in fear of reprisal by the guards. Id.
¶ 30. The Ohio court reversed finding that Lane had been denied a fair trial because he was unable to properly present evidence to support his defense. The court also appeared to have adopted a bright line rule for conducting trials in a prison setting when it said the following:
We therefore hold, without further analysis, that such trials offend due process as being fundamentally unfair because of the inherent potential for prejudice arising therefrom, that prejudice will be presumed, and that such trials are prohibited by both the federal and state Constitutions.
Id. at 1342-43.
¶ 31. In Vescuso v. Commonwealth, 5 Va.App. 59, 360 S.E.2d 547 (1987), the Virginia Court of Appeals considered a case where the trial of an inmate who had escaped was conducted inside the prison. The court held:
The practice of removing trials from the courthouse to a penitentiary, in the absence of any showing of overriding public necessity or justification, offends traditional notions of fairness and basic precepts of our criminal justice system.... We do not mean to imply that a trial may never be transferred from the courthouse to a penitentiary. However, before the constitutional right of a defendant to a public trial can be jeopardized, the record must contain findings of fact showing some clear and present overriding public interest or justification.
Id. at 551. The court found that the commonwealth had failed to produce any evidence to show the necessity of transferring the trial to the prison. Id. The record merely contained a letter from the trial judge to defense counsel explaining why he denied the defendants' motion for a public trial. Id. at 548. The court held that the letter was not evidence, and "even if we consider the letter, no facts or circumstances are disclosed concerning the trials of Vescuso and Fox to justify their trial in prison." Id. at 551. Therefore, the court found it necessary to reverse.
¶ 32. In Bright v. State, 875 P.2d 100 (Alaska 1994), the Alaska Supreme Court considered a case where an inmate charged with assaulting a fellow inmate was brought to trial inside the penitentiary. In Bright, the prosecutor raised the issue of whether Bright's trial should be held in the prison rather than at the courthouse. *825 Id. at 102. The prosecutor cited concerns over security, the fact that almost all witnesses were inmates at the prison, and there was inadequate transportation provisions for those inmate witnesses. Id. The trial judge agreed and ordered that the trial be moved to the prison. Id. at 103. A few of the trial judge's enumerated reasons for moving the trial included the fact that there were two defendants who would pose a substantial security risk at the courthouse, that there were inadequate holding facilities for the inmate witnesses at the courthouse, and that because the assault occurred at the prison, the jury would be aware of the fact that defendants were inmates regardless of where the trial was conducted. Id. at 103-04.
¶ 33. In reversing the trial judge's decision to hold the trial inside the prison, the Alaska Supreme Court held that the "judicial power to restrict or deny public access to court proceedings may be exercised only when unusual circumstances imperil a more important societal value, and then only when alternative measures have been considered and found wanting." Id. at 106-07. The court held, "we are unwilling to flatly declare that the Alaska Constitution prohibits holding a criminal trial in a prison under any and all circumstances. However, any decision to hold a trial in a prison must be subjected to the strictest scrutiny, and that decision must be supported by compelling reasons." Id. at 109. In essence, the court concluded that because the record contained neither testimony nor substantive discussion by the parties to support any of the trial judge's findings, it must reverse.
¶ 34. In 2001, the California Court of Appeals considered this issue in People v. Barnum, 104 Cal.Rptr.2d 19 (Cal.Ct.App.2001) (superseded on other grounds). Barnum's trial for assaulting a prison guard was conducted inside the prison. The court held that conducting the trial at the prison did not prejudice Barnum because the jury was necessarily going to learn he was an inmate due to the nature of the charges. Id. at 22. The California court declined "to infer the jury would likely conclude a defendant was guilty because the trial occurred inside a state prison, thereby disregarding their instructions and common sense." Id. at 25. Moreover, the court held that "selective use of in-prison trials is beneficial to the State, the taxpayer and, in some cases, the defendant. It is not an inherently prejudicial practice." Id. at 26.
¶ 35. Also in 2001, this issue came before the Oregon Court of Appeals in State v. Jackson, 178 Or.App. 233, 36 P.3d 500 (2001). Jackson's trial for sodomy of another inmate was held inside the prison and the public was excluded. There was, however, a live video transmission to the courthouse. Id. at 501. The court found that the record was devoid of any reason why the trial was held at the prison. Id. at 502. The State argued that because all of the witnesses were inmates and there was only one van in which they could be transported to the courthouse, there was substantial need to conduct the trial at the prison. Id.
¶ 36. The Oregon court expressed concern that the exclusion of the public tends to impress the jury with the enormity of the offense, and held, "that concern ... is compounded by the fact that the trial was not only closed to the public but was conducted within the confines of a prison." Id. at 505. Therefore, the court found that the fact that it may have been more convenient for the county not to have to transport inmate witnesses to testify in the courthouse "does not amount to a substantial showing of need; nor does the fact that many of the witnesses were located at the prison." Id. at 506.
*826 ¶ 37. In 2002, the Utah Supreme Court addressed this issue in State v. Daniels, 40 P.3d 611 (Utah 2002). Daniels was charged with killing another inmate. Id. at 614. The court held:
where the defendant was incarcerated and the alleged crime was committed inside the prison, those facts must inevitably come out at trial. Because the factual circumstances were inevitably going to be, and were, adduced as proof at trial, trying defendant in a courtroom located inside a prison did not present an unacceptable risk of presenting impermissible factors. We reiterate that no prejudice can result from seeing that which is already, or inevitably will be, known.
Id. at 618. However, the court cautioned:
to hold a criminal trial in a courtroom located inside a prison or other facility simply because a defendant is already incarcerated, or because to do so would be more safe or convenient, would also be error, absent adequate findings and compelling reasons. A case-by-case evaluation is necessary.
Id. at 620.
¶ 38. We recognize that there are conflicting opinions on this issue in several states. Nevertheless, we find that the right to an open and public trial does not mean that the State, in the exercise of its obligation to maintain order and provide for the safety of the general populace, may not impose reasonable, prudent and justified safeguards and restrictions on the manner in which public access to trials is permitted. The degree to which security precautions may be implemented and enforced necessarily varies, depending upon the concerns presented in the particular circumstances, and must, therefore, be evaluated on a case-by-case basis, as the Utah Supreme Court recognized in State v. Daniels. For that reason, we do not adopt the bright line rule of Ohio, as discussed in State v. Lane. Indeed, we hold that there are such limited circumstances where a trial may be held inside a prison.
¶ 39. Having determined that there are rare circumstances that may justify a trial being held inside the confines of a prison, we must examine the testimony presented, the alternatives considered and the relevant findings and conclusions of the trial court. As discussed above, the trial judge provided this Court with a thorough and detailed analysis as to why the trial was moved from the courthouse to the penitentiary, what alternatives he considered, the safety concerns that supported his decision to move the trial, and what arrangements were made for the public to attend.
¶ 40. The jury would learn that the defendants escaped from the maximum security unit at Parchman, a fact that was not contested. Certainly, since the jury would learn these facts, there is no prejudice that can result from the jury seeing that which was already, or inevitably would be, known.
¶ 41. Both Harper and Woolard were dangerous, violent and habitual offenders. As a result of their past criminal convictions, their previous escapes, and the evidence of their willingness to do anything to remain free, we find that the trial judge was correct to find a clear and present overriding public interest in safety for the public that justified the trial court's consideration of whether to conduct this trial inside the penitentiary.
¶ 42. Accordingly, we find that the trial judge properly considered the appropriate factors to ensure that the defendants received a fair trial and that the public interest in safety would be protected. Therefore, we hold that the trial judge did not abuse his discretion in ordering that the trials of these defendants be moved from *827 the courthouse to the Administrative Building at Parchman.

II. Whether the trial court erred in denying defendants' objection to the State's use of seven of its peremptory challenges against males.
¶ 43. Harper and Woolard next assert that the trial court erred in overruling their objection to the State's use of seven of its twelve peremptory challenges against males. In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that in order to make a prima facie showing of purposeful discrimination in the selection of a petit jury, a defendant must establish that he is a member of a cognizable racial group, that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race, and that this raises an inference that the prosecutor used that practice to exclude veniremen from the jury on account of their race.
¶ 44. The Batson rationale has been extended to gender discrimination. Bounds v. State, 688 So.2d 1362 (Miss.1997). It is only after the defendant presents a prima facie case of gender discrimination that the burden shifts to the State to come forward with gender-neutral explanations for challenging the jurors. Mack v. State, 650 So.2d 1289, 1297 (Miss.1994). Stated somewhat differently, before the trial judge is required to conduct a Batson hearing, it must be shown that a prima facie case for purposeful discrimination exists. Puckett v. State, 737 So.2d 322, 334 (¶ 32) (Miss.1999).
¶ 45. Here, the State struck seven males and five females. The defendants also struck three males. The trial judge found that a prima facie case of gender discrimination had not been shown. We agree and find no merit to this issue.

III. Whether the trial court erred in requiring defendants to be shackled and dressed in prison garb at trial.
¶ 46. Harper and Woolard contend that they were prejudiced when the trial judge required them to remain shackled and clothed in prison garb during their trial. In Rush v. State, 301 So.2d 297, 300 (Miss.1974), the supreme court held:
The appellant contends that being exposed to the jurors in handcuffs denied him a fair trial. It is a common-law right of a person being tried for the commission of a crime to be free from all manner of shackles or bonds, whether of hands or feet, when in court in the presence of the jury, unless in exceptional cases where there is evident danger of his escape or in order to protect others from an attack by the prisoner. Whether that ought to be done is in the discretion of the court, based upon reasonable grounds for apprehension.

(emphasis added.)
¶ 47. In the pre-trial conference about security issues for the trial, the trial judge asked the sheriff and Department of Corrections officials for recommendations on whether the defendants should be shackled and dressed in prison garb. Officer Todd Hudson, a corrections officer, testified that "these prisoners are extremely high-risk and to remove any restraints would be amiss due to their past escapes." Officer Hudson also noted that requiring the defendants to wear prison garb was justified because in the event they did manage to escape they could easily be identified as prisoners. The sheriff agreed and added that "if its any way possible with the Court, I wouldn't remove any restraints. I don't think, for the safety of the public and the court officers, we should take any of the restraints off."
*828 ¶ 48. In Cook v. State, 825 So.2d 678, 684 (Miss.Ct.App.2002), this Court ruled:
Though not normally permitted, there are circumstances in which the State may restrain a defendant. When reasonable grounds exist to apprehend a danger of escape, a trial judge has discretion to require shackles or other restraints. Rush v. State, 301 So.2d 297, 300 (Miss.1974). Here, the defendant had once escaped and successfully avoided capture for four months.
Based on the holdings in Rush and Cook, we find that the trial judge did not abuse his discretion in basing his security rulings on the recommendations of the law enforcement officers in charge of security and we find that he had reasonable grounds to require that the defendants be shackled and dressed in prison clothing.

IV. Whether the trial court erred in sentencing defendants as habitual offenders pursuant to Miss.Code Ann. § 99-19-83.
¶ 49. Harper and Woolard both assert that the trial court erred in sentencing them as habitual offenders, pursuant to Miss.Code Ann. § 99-19-83 (Rev.2000). Section 99-19-83 requires:
Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to and served separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, and where any one (1) of such felonies shall have been a crime of violence shall be sentenced to life imprisonment, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.
Certified copies of a defendant's commitment papers are competent evidence of previous convictions for purposes of proving that a defendant is an habitual offender. Estelle v. State, 558 So.2d 843, 848 (Miss.1990). Likewise, certified copies of indictments and sentencing orders are competent evidence of previous convictions. Duplantis v. State, 708 So.2d 1327, 1347 (¶ 101) (Miss.1998).
¶ 50. Here, the record indicates that both Harper and Woolard had been convicted twice previously of felonies, at least one of which had been a crime of violence, and such proof, in permissible form, was adduced at trial. Therefore, we find that the trial court did not err in sentencing defendants as habitual offenders pursuant to Section 99-19-83.

V. Whether the trial court erred in overruling Woolard's motion for a mistrial after the district attorney argued to the jury in closing arguments that the victims were "good Christian people."
¶ 51. During closing arguments, the district attorney referred to the victims as "good Christian people." Woolard then objected and moved for a mistrial, which the trial judge denied. Woolard argues that this statement was made by the district attorney in an attempt to prejudice the jury in favor of the victims, and as such it was misconduct on the part of the district attorney that required a mistrial.
¶ 52. In Rogers v. State, 796 So.2d 1022, 1027 (¶ 15) (Miss.2001), the supreme court held that "the prosecutor may comment upon any facts introduced into evidence, and he may draw whatever deductions and inferences that seem proper." During the trial of this case, several statements regarding the fact that the victims were church-going people were heard by the jury through testimony. For example, there was testimony that, at the time the defendants broke into the victims' home, *829 the victims were attending a church service. Also, when asked about what they did while they were tied up for two days, one of the victims stated, "[l]et's see, we prayed, we said all the Bible verses that we could remember."
¶ 53. Therefore, the district attorney's statement to the jury was fully supported by reasonable inferences that could be drawn from the evidence in the case. Accordingly, we find no error.

VI. Whether the trial court erred in denying Woolard's motion to abolish peremptory challenges.
¶ 54. Woolard asserts that the trial judge erred in denying his motion to abolish peremptory challenges. The Mississippi Supreme Court recently refused to abolish peremptory challenges in Brawner v. State, 2002-DP-00615-SCT 872 So.2d 1 (2004). Accordingly, we find no error in the trial judge's decision to deny the motion.

VII. Whether the trial court erred in not responding to Harper's motion for a psychological evaluation.
¶ 55. Harper asserts that the trial court erred in not responding to his motion for a psychological examination. However, Harper fails to cite any authority for the proposition that a possible mental impairment precipitated by the conditions of confinement requires a trial judge to order a psychological examination. Harper's argument therefore is procedurally barred.

VIII. Whether the trial court erred in ruling that testimony by Ronnie Collins, a Mississippi Department of Corrections employee, was not hearsay.
¶ 56. Ronnie Collins, a Parchman investigator and witness for the State, was allowed to testify, over Harper's objection, that after Harper and Woolard escaped "[w]e received information that they had been spotted in the Webb area." It is enough to say here that this testimony, hearsay or not, was innocuous and harmless. There was other testimony in the record that clearly established that Harper and Woolard were in the Webb community, including testimony from the victims who identified the defendants as the men who broke into their home.
¶ 57. Under Mississippi Rule of Evidence 103(a), before error can be predicated upon an adverse evidentiary ruling, it must appear that a substantial right of the party was affected. Jackson v. State, 594 So.2d 20, 25 (Miss.1992). In other words, the admission or exclusion of evidence must result in prejudice or harm if the cause is to be reversed on that ground. Id. We find that Harper was not prejudiced by this testimony because there was other evidence of his presence in the Webb area. Therefore, we find no error.

IX. Whether Harper was denied the effective assistance of counsel.
¶ 58. Harper contends that his court-appointed attorney rendered ineffective assistance of counsel because counsel never requested a psychological evaluation, never visited or attempted to discuss a defense to the charges or mitigating facts and circumstances, and never developed a trial strategy.
¶ 59. To prevail on his claim, Harper must demonstrate that his counsel's performance was deficient and that this deficiency prejudiced him in such a way that he was denied a fair trial. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *830 The counsel's deficiency is assessed by looking at the totality of the circumstances. Hiter v. State, 660 So.2d 961, 965 (Miss.1995). We, as an appellate court, apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Burns v. State, 813 So.2d 668, 673(¶ 14) (Miss.2001).
¶ 60. Harper's allegations are insufficient to demonstrate his attorney's ineffectiveness. Harper makes no claim of what evidence or conclusions a psychological evaluation may have yielded, and does not identify a possible defense, an alternate trial strategy, or any mitigating facts and circumstances that could have affected the outcome of his trial or his sentence. Harper has, therefore, failed to demonstrate a deficiency in his counsel's overall performance. Because there was no deficiency it is not necessary to determine whether Harper was prejudiced.
¶ 61. THE JUDGMENT OF THE CIRCUIT COURT OF TALLAHATCHIE COUNTY OF CONVICTION OF JOHN FRED WOOLARD AND ROY RANDALL HARPER OF COUNT 1: BURGLARY OF A DWELLING, COUNT 2: GRAND LARCENY, COUNT 3: GRAND LARCENY, AND COUNT 4: KIDNAPPING, AND SENTENCE OF LIFE IMPRISONMENT ON EACH COUNT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AS HABITUAL OFFENDERS, WITHOUT THE POSSIBILITY OF PAROLE, WITH THE SENTENCES TO RUN CONCURRENTLY TO EACH OTHER AND CONSECUTIVELY TO ANY OTHER PREVIOUSLY IMPOSED SENTENCES IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO TALLAHATCHIE COUNTY.
KING, C.J., BRIDGES AND SOUTHWICK, P.JJ., LEE, MYERS AND CHANDLER, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY. THOMAS, J., NOT PARTICIPATING.