Argued and submitted July 23, reversed and remanded for new trial
November 28, 2001

## STATE OF OREGON,
*Respondent,*

*v.*

## JAMES DONALD JACKSON,
*Appellant.*

98048756C; A106134

36 P3d 500

Rose Jade argued the cause and filed the supplemental brief and reply brief for appellant. With her on the opening brief were David E. Groom, Public Defender, and Andy Simrin, Deputy Public Defender.

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Janet A. Metcalf, Assistant Attorney General.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

WOLLHEIM, J.

Linder, J., concurring.

## WOLLHEIM, J.

Defendant appeals from his conviction for second-degree sexual abuse. ORS 163.425. He raises three assignments of error. Defendant argues first that he is entitled to a new trial because his trial, which was held within the confines of the Snake River Correctional Institution (SRCI) in a room that was not open to the public, violated constitutional provisions that entitle him to a public trial. Second, defendant argues that he is entitled to a new trial because the trial court erred in permitting the victim to testify from a remote location via a speakerphone during defendant's case-in-chief, in violation of defendant's confrontation rights. Finally, defendant asserts in a supplemental brief that the order of the Chief Justice of the Oregon Supreme Court permitting the Malheur County Circuit Court to designate SRCI as a location at which it may sit is void and that he therefore is entitled to dismissal with prejudice of the charge against him. We do not address defendant's assignment of error pertaining to the Chief Justice's order because it is unpreserved. We do not reach the issue concerning the victim's testimony, because we conclude that defendant is entitled to a new trial on the ground that he was denied his constitutional right to a public trial.

The facts are straightforward. Defendant was charged with first-degree sodomy. ORS 163.405. The crime was alleged to have been committed within SRCI, where defendant and the victim were both incarcerated. For reasons not stated in the record of this case, the jury was selected and sworn in at the courthouse in Vale but was then transported to SRCI for the evidentiary portion of the trial, which was conducted in a room at SRCI that was not open to the public. The court, however, arranged for live television transmission of the trial to the courthouse in Vale, where the images were broadcast in a room where seating was available for approximately 10 spectators. Apparently, a live television transmission camera also was set up to transmit images from the spectator area in the Vale courthouse into the room at SRCI where the trial was being held, although no tapes of such transmission are a part of this record. The live television transmission from the room at SRCI showed the judge, the

witness stand, and part of the jury box. The attorneys could not be seen on the live television transmission but their voices could be heard. Defendant could not be seen on the live television transmission.

At trial, the victim testified in person that, on September 11, 1997, he was transferred into a cell with defendant and moved out again that evening. He testified that, during the time they shared the cell, defendant twice forced him to submit to anal intercourse. Defendant presented a consent defense. The victim was recalled for further testimony by the defense but over defendant's objection he was permitted to testify from a remote location via speakerphone. The court instructed the jury on the crime of first-degree sodomy and on the lesser-included offense of second-degree sexual abuse, and the jury returned a verdict of guilty on the lesser-included offense of second-degree sexual abuse.

As noted, defendant objected to the trial being held inside SRCI in a room that was not open to the public. He based his objections on Article I, section 10, and Article I, section 11, of the Oregon Constitution. He reasserts his arguments under those constitutional provisions. Article I, section 10, provides, in part, that "[n]o court shall be secret, but justice shall be administered openly and without purchase, completely and without delay." Article I, section 11, provides, in part, that "[i]n all criminal prosecutions, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed[.]" Defendant contends that, because the public was unable to attend his trial, both of those constitutional provisions were violated.

■■ Although the protections afforded by the cited constitutional provisions are similar in many ways, the rights involved differ significantly, as does the scope of the protections. The right to a public trial afforded by Article I, section 11, is a right that is personal to the criminal defendant, whereas the protections of Article I, section 10, belong to the people at large and cannot be waived by individual litigants. *State ex rel Oregonian Pub. Co. v. Deiz*, 289 Or 277, 282-83, 613 P2d 23 (1980). Article I, section 10, rights are absolute, *see Oregonian Publishing Co. v. O'Leary*, 303 Or 297, 302,

736 P2d 173 (1987), whereas under Article I, section 11, there are circumstances in which a defendant's right to a public trial may be circumscribed if "the state makes a substantial showing of a need to limit that right." *State v. Bowers*, 58 Or App 1, 4, 646 P2d 1354 (1982). There exists some question as to whether the protections of these two provisions are coextensive in criminal proceedings. Also, case law does not make it entirely clear whether the "absolute" nature of the Article I, section 10, public right can, in fact, mandate that a criminal proceeding be open to the public in circumstances where an individual defendant's Article I, section 11, right might otherwise be circumscribed after a showing of substantial need by the state. In *Bowers*, we noted this issue but did not need to resolve it because, in that case, no showing of need to limit the public's attendance at trial was made. *Id.* As discussed below, the same is true here.

The record in this case is devoid of any reason why this trial was held at the prison. We are able to infer from the trial court file that the trial was originally scheduled to be held in the courthouse in Vale but was set over, after which the court decided that it would be held at the prison. We also can infer from certain documents and correspondence made part of the record on appeal that the impetus for the trial being conducted at SRCI came from the trial court rather than from the prosecutor.

In response to defendant's assertion that the procedure used here violated Article I, section 11, the state argues on appeal, first, that the live television transmission arrangement satisfied the "public trial" requirements of Article I, section 11.[1] The state further argues that, even if the live television transmission arrangements were not adequate in that

---

[1] The concurrence takes us to task for addressing the state's argument that the live television transmission arrangement made defendant's trial, in fact, a "public trial" for purposes of Article I, section 11. The concurrence apparently would move immediately to the state's alternative argument that, even if the live television transmission was not a "public trial" for purposes of Article I, section 11, there existed a substantial need to conduct the trial at the prison in a room not open to the public.

The concurrence characterizes our discussion of whether defendant, in fact, was given a "public trial" for purposes of Article I, section 11, as a "detour,"

regard, it was not required to make a showing of a substantial need to conduct the trial at SRCI, because defendant never asked that the court make specific findings as to whether a substantial need existed. Alternatively, the state suggests that this court may infer from the record that it had a substantial need to conduct the trial at SRCI because the majority of the witnesses (consisting of inmates and prison staff) were located there and because Malheur County had only one van in which to transport inmates from the prison to the county courthouse.

The threshold question is whether a live television transmission of a trial from a location not open to the public to a separate location open to the public, accompanied by a simultaneous live television transmission from the location open to the public back to the courtroom, is a "public trial" for purposes of Article I, section 11. To determine the meaning of the "public trial" provision, we look "to the specific wording [of that provision], the case law surrounding it, and the historical circumstances that led to its creation." *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). In its recent cases, the Oregon Supreme Court has increasingly focused on the intent of the framers and the people who adopted the constitutional provision in question. *See, e.g, Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 54-56, 11 P3d 228 (2000). That approach can be somewhat constraining when assessing the constitutionality of a procedure that depends entirely upon technology that was nonexistent at the time the constitution was framed and adopted.

The question before us is whether the people who framed the Oregon Constitution in 1857 and adopted it in 1859 would have considered a trial held inside of a prison at a location that was not open to the public nonetheless to be a "public trial" because images and sounds from the trial could be seen and heard at another location. The adjective "public,"

---

apparently taking the view that this issue is one of the "more difficult issues potentially posed by this case [that] need not be resolved[.]" 178 Or App at 245 (Linder, J., concurring). Actually, the more difficult issue that we determine that we need not resolve in this case concerns the scope of the public trial provision of *Article I, section 10*; we must, and do, address all of the parties' arguments concerning the scope of the public trial provision of Article I, section 11.

as defined in the 1828 *Webster's Dictionary*, was used in a number of ways:

"1.  Pertaining to a nation, state or community; extending to a whole people; as a public law, which binds the people of a nation or state, as opposed to a private statute or resolve, which respects an individual or a corporation only. Thus we say, public welfare, public good, public calamity, public service, public property.

"* * * * *

"3.  Open; notorious; exposed to all persons without restriction.

"* * * * *

"6.  Open to common use; as a public road.

"7.  In general, public expresses something common to mankind at large, to a nation, state, city or town, as is opposed to private, which denotes what belongs to an individual, to a family, to a company or corporation."

A law dictionary from the mid-nineteenth century provides assistance to our inquiry, as well. Within the definition of "trial," it includes in its section on "trial by jury" that "[t]o insure fairness this mode of trial must be in public." John Bouvier, *A Law Dictionary Adapted to the Constitution and Laws of the United States of America*, 451 (1839). It would seem from those sources that, as of the time the Oregon Constitution was drafted, a "public trial" was a trial that was held in public and not in private. Something that was in "public" was open and exposed. Modern dictionaries reveal that the general meaning of the words "public" and "trial" have not changed significantly in the last 150 years. *See, e.g., Webster's Third New Int'l Dictionary*, 1836 (unabridged ed 1993) (defining public as "accessible to or shared by all members of the community ‹ ~ hearing ›"); *Black's Law Dictionary*, 1108 (5th ed 1979) (defining public trial as "one that the public is free to attend").

The notion of a "public trial" in a criminal case was not a novel one when the Oregon Constitution was framed. The Sixth Amendment to the United States Constitution contained a similar provision that, "[i]n all criminal prosecutions, the accused shall enjoy the right to * * * a public

trial[.]" The Oregon Supreme Court noted in *State v. Osborne*, 54 Or 289, 292, 103 P 62 (1909), that the Article I, section 11, public trial provision was "to the same effect" as the Sixth Amendment's public trial provision.

In *Osborne*, the trial court excluded the public from the defendant's criminal trial on assault charges on the ground that the testimony would involve vulgar language. *Id.* at 291. The issue on appeal was whether the trial court's action denied the defendant his Article I, section 11, right to a public trial. The court noted various reasons why it is necessary for a trial to be open to the public. The court first observed that disputes can occur in the course of a trial that make it necessary for "bystanders [to] be called upon to evidence what occurred[.]" *Id.* at 295. The court further observed that, although both the judge and the prosecutor have duties to safeguard the rights of criminal defendants, they are not infallible:

> "It will not do to say that courts are impartial, and that both the courts and district attorneys are there to protect the accused from wrong as well as to convict the guilty. The law is intended not only for protection against the acts of those who knowingly or intentionally err, but against those as well who do wrong unintentionally, or from an erroneous sense of duty." *Id.*

The court also noted the historical basis for constitutional public trial provisions:

> "In the early history of the law, when the accused was not permitted to say anything in his own defense, or to be represented by counsel, the public prosecutor as well as the courts, it would seem, should have fully appreciated their duties in this respect; but the flagrant abuses extant in England, as well as in this country, prior to our Revolution, impressed upon the founders of our national and state governments the importance of providing against them by inserting in our fundamental laws the express provision that every person charged with crime shall have a public trial. The language used for this purpose is specific, clear, and free from any possible misunderstanding." *Id.* at 296.

The court then discussed how a defendant's rights would be impaired by the lack of a public trial. First, it noted that the exclusion of the public "tends to impress the jury

with the enormity of the offense for which the accused is to be tried." *Id.* at 296-97. Second, it noted that a spectator at a trial might hear testimony that would cause the spectator to "recall facts to which he will call attention, and thus aid in establishing the innocence of the accused[.]" *Id.* at 297. Third, the court concluded that the presence of friends and supporters of a criminal defendant could serve to offset the prejudice incident to being charged with a crime. Finally, the court noted that the presence of friends and supporters of witnesses could "enable the court and jury to elicit from that witness the testimony to which the defense or prosecution is entitled." *Id.*

*Osborne* was cited with approval by the United States Supreme Court in *In re Oliver*, 333 US 257, 271, 68 S Ct 499, 92 L Ed 682 (1948), in a discussion of the historical context of public trial provisions in Anglo-American law:

> "The traditional Anglo-American distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the English Court of Star Chamber, and to the French monarchy's abuse of the *lettre de cachet*. All of these institutions obviously symbolized a menace to liberty. In the hands of despotic groups each of them had become an instrument for the suppression of political and religious heresies in ruthless disregard of the right of an accused to a fair trial. Whatever other benefits the guarantee to an accused that his trial be conducted in public may confer upon our society, the guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of the judicial power." (Footnotes and citations omitted.)

The *Oliver* Court went on to quote from Jeremy Bentham:

> " 'Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account. Recordation, appeal, whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance.' " *Id.* at 268, *quoting* Jeremy Bentham, 1 *Rationale of Judicial Evidence*, 524 (1827).

Thus, the distinction drawn by Bentham—and the one at least implicitly recognized by the courts in *Osborne* and *Oliver*—is between "checks" that ensure the public's confidence in the judicial system and "cloaks" that obfuscate the process and compromise the public's confidence. The primary "check" is the constitutional provision that a trial be public.

In the present case, the state acknowledges the concerns expressed by the courts in *Osborne* and *Oliver* but argues that all of those concerns were met by the procedure used here. The state posits that, because the live television transmission was simultaneously broadcast in a room in the courthouse in Vale, the trial was "subject to contemporaneous review in the forum of public opinion," *Oliver*, 333 US at 506, the process would serve to insure the public's confidence in the court system, and the proceedings were likely to come to the attention of any potential witnesses.

■  We disagree that the concerns expressed by the courts in *Osborne* and *Oliver* are obviated by the live television transmission of a trial held within a prison and not open to the public.[2] Historically, constitutional public trial provisions are rooted in the public's *distrust* of courts and prosecutors operating behind closed doors, and the existence of a live television transmission shown in a courthouse, with the implicit assurance *by the courts or prosecutors* that it is indeed an accurate representation of what is occurring behind closed doors, is not likely to inspire the confidence of a distrustful public. Although live television transmission cameras were unknown to Jeremy Bentham, it seems unlikely that this method of "recordation" would have inspired such confidence that Bentham would have regarded it as a "check"

---

[2] The concurrence accuses us of crafting a four-part "litmus test" from *Osborne*. 178 Or App at 248 (Linder, J., concurring). We do not view *Osborne* as establishing any sort of rigid test, but rather view it as identifying several relevant considerations in approaching "public trial" issues under Article I, section 11. Certainly, there is nothing in our analysis that would compel "a trial court judge faced with safety and security concerns with an all-or-nothing choice: open the courtroom or close it," as the concurrence posits. *Id.* at 249 (Linder, J., concurring). Our conclusions regarding the inadequacy of television transmissions alone to satisfy the public trial guarantees of Article I, section 11, simply cannot be read as suggestions that television transmissions would never be appropriate in circumstances where a substantial showing of need was made to limit spectators' attendance in the courtroom.

rather than a "cloak," much less a "check" that would obviate the need for a trial to be held in public.

Nor are the concerns expressed by the court in *Osborne* met by the live television transmission procedures used in this case. As noted, the court expressed concern that the exclusion of the public tends to impress the jury with the enormity of the offense. 54 Or at 296-97. That concern is not only not met here but is compounded by the fact that the trial was not only closed to the public but was conducted within the confines of a prison.

The court in *Osborne* also opined that the presence of spectators at trial was important because such spectators might, under some circumstances, become witnesses, either to irregularities within the proceeding itself or because they hear testimony that leads them to realize or recall that they have knowledge of facts at issue in the case. *Id.* at 295, 297. Concerns about irregularities in the proceedings are not met by the argument that such irregularities would be seen by viewers watching the live television transmission. For example, situations might arise where a person comes forward with information about jury misconduct or witness perjury overheard during a recess. The presence of a camera trained on the witness stand during the taking of evidence would not assist in bringing irregularities such as those to light. As to the likelihood of spectators springing forth with surprise testimony about the facts of the case, we acknowledge that such events are not only unlikely but quite naturally not regarded with favor by trial courts attempting to preside over orderly proceedings. Nonetheless, to the extent that a spectator wishes to come forward with fact or impeachment evidence, it is certainly more likely that the spectator could do so successfully if he or she was in the courtroom where the trial was being held, rather than at a remote location to which the trial was being transmitted.

Third, the *Osborne* court noted that the presence of friends of a defendant could offset the prejudice that a jury might feel due to the fact that a crime was charged. That concern is not met in any way by the live television transmission

arrangement here. Finally, the court observed that the presence of friends and supporters could be of assistance to witnesses to both the prosecution and the defense. *Id.* Here, the setting of the trial was quite unfortunate in that regard. As noted, the majority of the witnesses were inmates or staff at SRCI. The record in this case reveals several notable aspects of prison culture, including suggestions that inmate rape is tolerated, if not condoned, by some staff and suggestions that an inmate who reports a rape may not be safe within the prison. According to the victim, he had a very difficult time within SRCI after his accusation against defendant became known. It is certainly possible that conducting the trial within the confines of the prison where the crime was alleged to have occurred—and at least arguably was condoned—in a proceeding that was not open to the public could have affected the testimony of both prosecution and defense witnesses.

In sum, and particularly given the historical importance of the public trial guarantee, none of the concerns expressed by the courts in *Osborne* or in *Oliver* is obviated by a live television transmission of a trial held within the confines of a prison in a room not open to the public.[3]

Moreover, as noted above, the state made no "substantial showing of a need" to conduct the trial within SRCI in a room not open to the public. The state's suggestion that it need not make such a showing unless a criminal defendant asks a court to make findings of whether there has been a showing of need is entirely unsupported by any of the case law imposing the burden upon the state to show such a need.

---

[3] The concurrence characterizes our holding as a "flat declaration that transmitting a trial live to the public—not just in this instance, but in all instances—does *nothing* to advance any interest inhering in the right to a public trial." 178 Or App at 248 (Linder, J., concurring) (emphasis added). That is an erroneous characterization of our holding. We emphasize that our holding is limited to the facts of this case. The issue before us is two-fold: First, did the live transmission of the trial to the courthouse in Vale make this a "public trial" and second, if not, was there a substantial showing of need by the state to limit the public's attendance at the trial. We have answered those questions in the negative but have not speculated about whether a live television transmission "advances any interest." It is entirely possible that, if the state actually *made* a showing of need to restrict the public's attendance at trial, the fact that the trial was transmitted live to another location could well be a part of a determination as to whether those restrictions were appropriate. However, that is not the issue before us in this case.

*See, e.g., Bowers*, 58 Or App at 4. Defendant raised his constitutional objection to the exclusion of the public from his trial; in meeting that objection, it was incumbent upon the state to make a substantial showing of its need in order to justify the exclusion of the public from the trial if it was able to do so.

Finally, even assuming that the state may make its "substantial showing of a need" for the first time on appeal by pointing out things in the record to demonstrate that it was more convenient to have the trial in the prison, we do not find the state's arguments persuasive. That it may have been more convenient for the county not to have to transport inmate witnesses to testify in the courthouse in Vale because only one van was available for transport does not amount to a substantial showing of need nor does the fact that many of the witnesses were located at the prison, particularly in light of the fact that the prison is located only a short distance from the courthouse in Vale.

We conclude that defendant's conviction must be reversed because he was not granted his constitutional right to a public trial, as afforded by Article I, section 11, of the Oregon Constitution.[4]

Reversed and remanded for new trial.

**LINDER, J.,** concurring.

I concur in the result that the majority reaches but not in the path that it takes to get there. The majority begins by stating that some of the more difficult issues potentially posed by this case need not be resolved because "no showing of need to limit the public's attendance at trial was made." 178 Or App at 237. But the majority does not return to that decisive point until the end of its opinion. *Id.* at 244. It instead detours to construct a four-pronged test that is as uncertain in its application as it is in its source. *Id.* at 242-44. Applying that test, the majority then examines whether live television transmissions of trial proceedings offer criminal defendants any of the benefits of a public trial. *Id.* The majority concludes categorically that such transmissions do

---

[4] We express no opinion concerning the constitutionality of a public trial held at SRCI.

not. *Id.* at 243-44. The majority's reasoning is not tied to the characteristics of the live television transmission in this case nor otherwise limited to the facts before us. Rather, based on a purely abstract examination, the majority issues a *per se* indictment of the efficacy of live television transmissions generally.

This case can and should be decided on a much narrower ground. As the majority recognizes, the right to a public trial secured by both Article I, section 11, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution is not absolute. On a proper showing of need, a court can close a criminal trial to the public. *See generally Waller v. Georgia*, 467 US 39, 46, 104 S Ct 2210, 81 L Ed 2d 31 (1984) (closure of court proceedings requires a strong showing of the need to exclude the public and a restriction on public access that is no broader than necessary to serve that need); *State v. Bowers*, 58 Or App 1, 646 P2d 1354 (1982) (same); *State v. Romel*, 57 Or App 372, 644 P2d 643 (1982) (same). The closure can be partial (as when segments of the public are excluded) or complete (as when all members of the public are excluded for some or all of the proceedings), depending on the strength and nature of the showing of need. *See generally Judd v. Haley*, 250 F3d 1308, 1314-17 (11th Cir 2001) (discussing analysis and representative cases).

From those principles alone, this case can be readily resolved. The state's primary position is that no showing of need was required because defendant's right to a public trial was not burdened or infringed to any extent. According to the state, by transmitting the proceedings live to interested members of the public at the Vale courthouse, defendant received the full benefit of his constitutional right to a public trial. We need not decide whether that argument under any circumstances could prevail; it is enough to conclude that, on this record, it cannot. The means used to transmit *this trial* imposed significant limitations on the viewing public's ability to observe the proceedings. As the majority points out, no member of the public could see more than part of the jury box, and therefore no member of the public or the public generally could observe all of the jurors or know that all jurors were present throughout the full trial. Of equal or greater significance, no member of the public or the public generally could

view defendant at counsel table and in attendance at trial. Finally, no member of the public could see the lawyers. Those deviations from the traditional and normal access that the public would have by being physically present *burdened* defendant's right to a public trial, even if they did not fully frustrate that right. Because of that burden, the trial court's decision to close the trial to public attendance had to be supported by a showing of need. Here, no such showing was made.[1] I would reverse on that reasoning alone.

The majority, however, chooses to venture farther. My first concern is with the four-pronged test for determining whether a proceeding is a public trial that the majority derives from *State v. Osborne*, 54 Or 289, 103 P 62 (1909). In *Osborne*, at the request of the prosecutor and over the objection of the defendant, the trial court excluded the public from the courtroom. The issue was whether the defendant had to demonstrate actual prejudice in order to prevail on his claim that he had been deprived of his constitutional right to a public trial. The court held that actual prejudice would be presumed. *See also State v. Blake*, 53 Or App 906, 913, 633 P2d 831, *appeal dismissed* 292 Or 486 (1982) ("The *Osborne* court did not require the defendant to demonstrate actual prejudice. Rather, the court found that once the defendant showed his constitutional right to a public trial had been violated, actual injury would be conclusively presumed."). The court's holding in *Osborne* was based, in part, on the following reasoning:

> "It needs but a moment's reflection to be able to conceive of many ways in which a prisoner deprived of the presence of the public might be injured. In the first place, the mere declaration that the public shall be excluded tends to impress the jury with the enormity of the offense for which the accused is to be tried, carrying with it, to some extent at least, prejudice against the person so charged. It is not an unusual occurrence that some person in an audience attending a trial will upon hearing a narrative of the incidents connected with the crime charged, recall facts to which he will call attention, and thus aid in establishing the

---

[1] Secondarily, the state argues that the need for closing the trial can be inferred from the record. I agree fully with the majority's analysis on that point. *See* 178 Or App at 244-45.

innocence of the accused. Were the public excluded, however, such aid would not be available, and the conviction of the innocent might result. Again, the presence of friends of the accused often serves to impress the jury favorably, and to that extent, at least, counteract the prejudice usually incident to being accused of an offense which the court may think the public should not hear." *Osborne*, 54 Or at 296-97.

Based on the above discussion, the majority crafts a four-pronged test for determining whether or not a trial is public. The majority is right that those are pertinent concerns that underlie the need for a public trial. But there is no indication in *Osborne* that those concerns were intended to be a formula for deciding whether a defendant's trial was a public one. Further, the majority leaves unanswered several significant questions concerning how its test is to work. Must a proceeding fully satisfy all prongs of the test to be a public trial? Are some of the prongs more important than others? What if some prongs are not satisfied, but others are? What if the interests that underlie the prong are furthered to some degree, just not fully? Here, applying its four-pronged test, the majority concludes that a live television transmission of a trial does not serve some interests —*i.e.*, to "inspire the confidence of a distrustful public." 178 Or App at 242—and simply expresses uncertainty as to others, *i.e.*, "[i]t is *certainly possible* that conducting the trial [under those circumstances] *could have* affected the testimony of both prosecution and defense witnesses." *Id.* at 244 (emphasis added). Which of those conclusions makes this not a public trial? In my opinion, the concerns expressed in *Osborne* were not intended to be and should not be characterized and applied as a constitutional litmus test.

I am also troubled by the majority's flat declaration that transmitting a trial live to the public—not just in this instance, but in all instances—does nothing to advance any interest inhering in the right to a public trial. In effect, the majority holds that public observation of a trial via live television transmission is *no better than no public observation* at all. That holding defies common sense and common experience. We are a society that is highly reliant upon and, for the most part, trusting of the images conveyed via live media. Radio and television permeate our daily lives and are the

means by which we gain much of our information about the world and its most important events. Depending on how available technology is implemented, a live television transmission of a trial has the potential to make the proceedings far more open and public—indeed, notoriously so—than they would be otherwise. As members of the generation that lived through the televised criminal trial of O.J. Simpson, we have experienced that reality first-hand. To be sure, unlike the O.J. Simpson trial, here no member of the public was allowed physically to be present to observe the proceedings. Because of that, some showing of need was required before defendant's right to a public trial could be burdened as it was in this case. But, contrary to the majority's analysis, neither this nor any other trial that is transmitted live to the public can be fairly equated with a clandestine proceeding held behind closed doors and "cloaked" in total secrecy. Here, the doors may have been closed but the windows were open.

By treating that distinction as one that makes no difference, the majority skews the legal analysis for other cases. The degree to which a defendant's right to a public trial constitutionally may be burdened should depend on the strength and character of the need to limit public attendance at the trial. The inquiry, moreover, should allow for an assessment of steps a court might take, short of total closure of a trial, that would give the public a meaningful opportunity to observe the proceedings, even if the opportunity is not the same or as complete as physical attendance in the courtroom. *See generally Waller*, 467 US at 48.[2] The majority's decision in this case, however, leaves a trial court judge faced with safety and security concerns with an all-or-nothing choice: open the courtroom or close it. The majority thus forecloses the possibility that a live television transmission of a trial could be implemented as a reasonable alternative to complete closure, one that imposes less of a burden on a defendant's right to a public trial and, as a result, can be

---

[2] Under *Waller,* the federal analysis requires four factors to be satisfied before a courtroom may be closed: (1) "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced"; (2) "the closure must be no broader than necessary to protect that interest"; (3) "the trial court must consider reasonable alternatives to closing the proceeding"; and (4) the court "must make findings adequate to support the closure." 467 US at 48.

implemented on a less stringent or different showing of need than a complete lack of public access would require. In doing so, the majority has eliminated important middle ground in the daily efforts of trial courts to address the difficult and increasingly challenging problems of courtroom security and witness safety, and it has done so when the constitutional principles at work do not.

For those reasons, I respectfully concur.