No. 278 April 2, 2025 405

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TRACY LAMPRON CLOUD,
aka Tracy Lynn Cloud,
*Defendant-Appellant.*

Washington County Circuit Court
20CR01720; A177588

Eric Butterfield, Judge.

Argued and submitted February 25, 2025.

Daniel C. Bennett, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Joanna L. Jenkins, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, Kamins, Judge, and Jacquot, Judge.

JACQUOT J.

Supplemental judgment reversed and remanded for entry of judgment omitting restitution award of $1,087,466; otherwise affirmed.

## JACQUOT, J.

Defendant, who shot and killed her husband, appeals from a judgment of conviction, after a jury trial, of murder in the second degree, raising three assignments of error that she asserts require reversal of the conviction: That the trial court erred in denying her motion to dismiss or in failing to impose alternative sanctions for the state's asserted violation of the attorney-client privilege; that the trial court erred in denying her motion for a judgment of acquittal based on her defense of self-defense; and that the trial, which was conducted pursuant to the Chief Justice's protocols during the COVID 19 pandemic, violated her constitutional rights to a public trial. Defendant also appeals from a supplemental judgment awarding $1,157,967 restitution to the victim's estate, assigning error to a portion of the award—$1,087,466—that the state asserted represented economic loss to the estate.[1] Defendant has filed a *pro se* supplemental brief raising multiple assignments of error.

We conclude that the trial court did not err in denying defendant's motions to dismiss and for a judgment of acquittal, and that the Chief Justice's protocols for conduct of the trial did not result in a violation of defendant's constitutional right to a public trial. We conclude, however, that the trial court did err in awarding restitution of $1,087,466, asserted to represent economic loss to the estate. We reject the remaining assignments of error. We therefore reverse in part the supplemental judgment's award of restitution of $1,087,466 for "economic loss," but affirm defendant's conviction.

We summarize the relevant facts. Defendant shot and killed her husband in their home on September 23, 2019. Immediately after the shooting, defendant called 9-1-1 and told the dispatcher that she had shot the victim in self-defense, because he was threatening her with a gun.

In a statement to an investigating officer immediately after the shooting, defendant said that, as she walked into the parties' bedroom, the victim pointed a gun at her and told her to fire her attorney. Then, as she turned to run out of the room, she heard "the sound of the slide being racked," at

---

[1] The restitution award also included restitution for attorney fees in the amount of $70,501, which defendant does not challenge on appeal.

which point defendant turned around, drew a handgun from her fanny pack, and shot the victim in the chest three times.

Although defendant maintained that she had acted in self-defense, the state suspected that she had a financial motive for the killing. Further investigation led to the filing of an indictment against defendant in January 2020 for the victim's murder. Police attempted to locate defendant, but she was in California when law enforcement officers came to her house to serve an arrest warrant.

Defendant had been named as the trustee of a trust created by the victim's father, in which the victim was the sole beneficiary. The trust included funds and real property in California. Attorney Kit Jensen had been representing defendant on the trust and probate issues associated with the victim's death. Jensen was aware that defendant had shot the victim and that she claimed to have done so in self-defense. Jensen is not a criminal defense attorney and did not represent defendant in that capacity. But Jensen's representation included defending defendant in the probate proceeding from an assertion by the victim's family that defendant should be deprived of her inheritance under the "slayer" statute, ORS 112.465.[2] To aid in that defense, Jensen had asked defendant to give him financial records that might bear on that claim and to prepare a summary of the circumstances of the victim's killing.[3]

Upon learning that police had attempted find her at her home, defendant contacted her friend Amy Castro and

_____

[2] ORS 112.465(1) provides:

"Property that would have passed by reason of the death of a decedent to a person who was a slayer or an abuser of the decedent, whether by intestate succession, by will, by transfer on death deed, by trust, or otherwise, passes on death and vests as if the slayer or abuser had predeceased the decedent."

[3] Jensen testified at the hearing on defendant's motion to suppress:

"[JENSEN:] I asked her to prepare names of people that would be witnesses that could assist and that could help her defense. I asked for, you know, names, addresses, phone numbers. I also asked her to prepare just kind of a summary of whatever she might have remembered that would be helpful in her defense.

"[DEFENSE COUNSEL:] Did you ask her to do those things because it would make your job, in representing her, easier?

"[JENSEN:] Yes. And I instructed her that that should—whatever she prepared should be addressed to me, as her attorney."

asked Castro to remove a laptop computer, cell phones, and documents from her residence and take them to Jensen's law office. On January 13, 2020, Castro gathered those items and brought them to Jensen's office.

Before Castro brought the items to Jensen and on that same day, defendant called Jensen and told him that she was aware that law enforcement personnel were attempting to search her house and that she wondered whether she might be subject to criminal charges. She told Jensen that Castro would bring in the cell phones and the box of documents for him to keep. She scheduled an appointment to meet with Jensen to go over the materials the next day.

Defendant had not mentioned a laptop to Jensen. Thus, Jensen rejected the laptop that Castro attempted to give him but took delivery of the cell phones and a box of documents. He put the cell phones in an envelope in a filing cabinet and put the box of documents in a storage area. Jensen did not look at the materials but thought that the box might contain the information that he had asked defendant to prepare to assist in her defense of a potential slayer petition.[4]

Defendant did not come to her appointment with Jensen on January 14. On January 15, 2020, Castro told a deputy who was surveilling defendant's residence that defendant had asked her to remove a laptop computer, a cell phone, and documents from defendant's residence and that she had delivered the items to Jensen.

Jensen learned on January 17, 2020, that defendant had been indicted for the murder of her husband.

On January 22, 2020, the lead detective on the case learned of Castro's delivery of items to Jensen. Police believed that the items delivered to Jensen would contain evidence in the case related to defendant's motive, financial transactions, and movements and activities surrounding the shooting of the victim.

---

[4] Jensen testified:

"So that's what I understood would be brought in by Amy Castro is memos and materials that would be helpful to her defense, and that we would review them the following day. And I did not know about a criminal indictment at that time."

Police applied for and obtained a warrant to seize the cell phones and documents delivered to Jensen. The warrant specified that the items seized "shall be brought to the Court by Detective Rookhuyzen for an in-camera review by the judge to determine whether the contents fall within the attorney-client privilege or contain evidence related to the above investigation."

Police served Jensen with the warrant on January 24, 2020. Jensen cooperated with the warrant and produced a banker's box containing documents and two cell phones. Police were informed that Jensen did not have the laptop. Police did not search the law office.

Police worked with Jensen to provide a receipt for the seized items. They opened the box briefly to identify the items by category but did not look at individual documents. Jensen sealed the box. Rookhuyzen then carried the sealed box to the judge's chambers, where it was received by the judge's staff or the judge for the judge's *in camera* review. The box included financial records; bills for services to defendant from defendant's attorneys; letters between counsel and defendant; a memorandum from defendant to her lawyer; and work product created by defendant's divorce attorney listing all of the marital finances, with notations.

Defendant's criminal defense attorney filed a motion requesting a denial of the request for the court's *in-camera* review of the documents, a return of the items to Jensen, and the appointment of a special master to review the electronic information from the cell phones. The trial court denied defendant's request and, on January 29, 2020, issued an order stating that it had conducted its *in-camera* review of the seized records and had concluded that the records were "not subject to the attorney-client privilege or attorney work product privilege." The order released the documents to the sheriff's office for further examination. The police took possession of the items and processed them as evidence.

Meanwhile, defendant rented a vehicle in California and drove back to Oregon. She stayed for a couple of days at a friend's house, then left, saying she was going to the store.

On January 20, 2020, paramedics and ambulance crews in Banks, Oregon, found defendant unconscious in the

driver's seat of her rented car and provided lifesaving measures to defendant, who had overdosed on Fentanyl.

When paramedics found her, defendant had a green notebook on her lap. On the cover were handwritten the words "memos to my lawyer." Police looked through the notebook for information that could identify defendant's condition and help in her treatment and found information in the notebook consistent with an attempt to take her own life. They gave the notebook to a responding officer.

Police obtained a search warrant for the green notebook, with the same requirement for *in-camera* inspection as the materials seized from Jensen's law office. The court conducted an *in-camera* review, determined that the notebook was not subject to the attorney-client privilege, and returned it to law enforcement.

Defendant filed a motion to suppress the materials contained in the box that had been obtained from Jensen's office through the search warrant. Defendant relied on ORS 9.695, which provides:

"(1)  Notwithstanding ORS 133.535, the files, papers, effects or work premises of a member *relating to the provision of legal service by the member* shall not be subject to search or seizure by any law enforcement officer, either by search warrant or otherwise.

"(2)  The provisions of subsection (1) of this section do not apply where there is probable cause to believe that the member has committed, is committing or is about to commit a crime.

"(3)  As used in this section, 'member' means a member or associate member of the Oregon State Bar or a person licensed to practice law in any court of this state or any court of record of the United States or of any state, territory or other jurisdiction of the United States.

"(4)  Evidence or the fruits thereof obtained in violation of this section shall be inadmissible in any criminal or civil action or proceeding, except for an action or suit brought for violation of this section or the rights protected thereby."

(Emphasis added.) At a hearing before the same judge who had issued the search warrant and who had conducted the

*in camera* inspections, defendant argued that, although the materials subject to the warrant could have been obtained through subpoena, ORS 9.695 prohibited a search of Jensen's office in the absence of probable cause that Jensen had committed a crime. Because there was no probable cause that Jensen had committed a crime, defendant argued, the search of Jensen's office was unlawful under ORS 9.695, and the seized items must be suppressed.

The state responded that the state had not "searched" the office, *per se*, because Jensen had acquiesced in the warrant and had turned the items over voluntarily— as if they had been subpoenaed. The state further contended that ORS 9.695 was inapplicable, because defendant had not sent the materials to Jensen's office for the purpose of legal services.

The parties presented argument to the court about the meaning of ORS 9.695 and, particularly, the significance of the phrase "relating to the provision of legal service by the member." Although it had issued the warrant, the court was persuaded by defendant's argument that the materials seized from Jensen's office should be suppressed under ORS 9.695, and it granted defendant's motion to suppress the contents of the box.

The parties then addressed defendant's motion to dismiss based on an asserted violation of defendant's attorney-client privilege. Defendant contended that, in seizing and then using the materials in the box and the green notebook, the state committed a deliberate violation of defendant's attorney-client privilege, ORS 40.225 (OEC 503) (permitting the client to prevent the disclosure of "confidential communications made for the purpose of facilitating the rendition of professional legal services to the client"), and that, as a result, the investigation and prosecution were irredeemably tainted, and the only remedy was dismissal.

The state responded that, as the trial court had previously determined, the seized materials were not privileged under OEC 503, because they were not confidential communications made for the purpose of facilitating the rendition of legal services. For example, the state noted

that defendant held the green notebook when paramedics found her during her attempt to take her own life, and that she could not have intended for it to remain confidential. The state further asserted that the extreme sanction of dismissal was not appropriate, because the state's possession of the items was inadvertent and in compliance with the trial court's previous *in camera* review and release of the materials. Additionally, the state argued that the prosecution had not relied on or derived information from the materials that it did not already have in its possession:

> "Nothing derived from either of those two sources, the green notebook or the box of contents delivered by Amy Castro, drove the State's investigation. Nothing that was developed from those items was detrimental to defense in this case. The defendant's strategy of claiming self-defense was articulated by this defendant to Deputy Rambin on the day of the murder, so there was nothing new that was gathered from either of these items."

The lead detective on the case testified that the state had previously been aware that defendant claimed to have shot the victim in self-defense and that there was nothing in the box of documents that provided any investigative leads or guided the investigation in the case. Finally, in response to inquiry by the court, the prosecutor explained that the state was very unlikely to offer any of the materials into evidence.

Defense counsel responded:

> "So that's just the problem, Your Honor. This is not the—the items seized are exculpatory. They—they laid out [defendant's] defense in some amount of detail. I mean, she described exactly what happened in the shooting. She—she tells her side of the story in these items. So, I have no expectation that the State's going to offer those in its case in chief because they lead to the inevitable conclusion that [defendant] was acting in self-defense."

The trial court explained that it continued to conclude that the contents of the box was not privileged, because it was not a communication by defendant to facilitate legal services. Rather, the court found, defendant sent the box to Jensen's office for some other purpose—to "secret or just get rid of things," and that the contents of the box did not have

"anything to do with * * * receiving legal services." The court further concluded that the contents of the green notebook were not privileged, because they were not intended to be confidential. The court found that, despite stating that it included "memos for my lawyer," the green notebook contained primarily a justification for the killing and a long "suicide note" to be found with defendant after her death. The court denied defendant's motion to dismiss. But the court determined that a small portion of the contents of the green notebook, instructing on the disposition of defendant's property, would be suppressed.

We address defendant's assignments of error in reverse order. We address first defendant's third assignment of error, in which she asserts that the trial court erred in denying her motion to dismiss or to impose alternative sanctions, based on the state's alleged violation of defendant's attorney-client privilege in using the green notebook and materials obtained from Jensen's office. Defendant contends that the green notebook and the materials seized from Jensen's office contained attorney-client privileged materials and that the state's use of those materials constituted a purposeful and unconstitutional intrusion into defendant's attorney-client privilege, which must be presumed to be prejudicial. Additionally, defendant points out that she had chosen not to provide the state with her view of the circumstances of the victim's death but that the state's seizure and use of the materials and the green notebook gave the state a window into defendant's defense strategy. Thus, even though most of those materials were not admitted at trial, defendant contends, their use by investigators and the prosecutor violated defendant's right to remain silent as well as her right to counsel, causing prejudice to defendant. Citing *State v. Greenwood*, 332 Or App 166, 177, 548 P3d 831 (2024) (a purposeful intrusion into the attorney-client privilege results in a rebuttable presumption of prejudice); *State v. Russum*, 265 Or App 103, 333 P3d 1191, *rev den*, 356 Or 575 (2014) ("[N]o presumption of prejudice arises in the absence of evidence of a purposeful intrusion that conveys the content of attorney-client communications to the prosecution."); and a South Carolina and federal case, *State v. Quattlebaum*, 338 SC 441, 448, 527 SE2d 105 (2000) ("Deliberate prosecutorial

misconduct raises an irrebuttable presumption of prejudice. The content of the protected communication is not relevant."); *Shillinger v. Haworth*, 70 F3d 1132, 1142 (10th Cir 1995) ("Because we believe that a prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant, *** absent a countervailing state interest, such an intrusion must constitute a per se violation of the Sixth Amendment."); defendant contends that the state's actions were a deliberate intrusion into the attorney-client relationship that are presumed to be prejudicial and that, therefore, suppression was not an adequate remedy, and the trial court erred in denying her motion to dismiss the murder charge. In light of the deliberate nature of the intrusion, defendant contends, which so "pervades the investigation and prosecution of the case" such that it cannot be isolated from the case as a whole, defendant contended that dismissal with prejudice was required. *See State v. Worth*, 274 Or App 1, 8, 360 P3d 536 (2015), *rev den*, 359 Or 667 (2016) (dismissal with prejudice after a violation of Article I, section 12, is warranted when "(1) the misconduct is so prejudicial that it cannot be cured by means short of mistrial; (2) the prosecutor knew that the conduct was improper and prejudicial; and (3) the prosecutor either intended or was indifferent to the resulting mistrial or reversal") (internal quotation and citation omitted; emphasis in original). If dismissal with prejudice is not the required sanction, defendant contends, then reversal of defendant's conviction is required as an alternative sanction.

The state responds that the trial court did not err, because the sanction of dismissal is not warranted. The state asserts that the materials were not privileged and, further, any interference with defendant's attorney-client privilege by the state was not deliberate. We agree with both arguments. The trial court made a finding that defendant had the box delivered to Jensen's office for some reason other than legal representation, and there is evidence to support that finding. And the trial court found that defendant could not have intended the contents of the green notebook to be confidential. Those findings are supported by evidence in the record and persuade us that the trial court did not err in

determining that defendant did not have a protected attorney client privilege in the items.

We further agree that, even assuming that the items were subject to the attorney-client privilege, any interference by the state was not deliberate. At the time the state obtained the materials, the trial court had determined, after its *in-camera* inspection, that the materials were not privileged. In light of the trial court's determination, we cannot conclude that any intrusion into defendant's attorney-client privilege by the state was deliberate. We further agree with the state that this case is distinguishable from *Greenwood*, 332 Or App at 190, in which we held that a presumption of prejudice arose from the detective's deliberate intrusion into confidential communications between the defendant and the attorney.

In the absence of evidence that the state sought deliberately to interfere in defendant's attorney-client privilege, it was defendant's burden to show prejudice to her constitutional rights, such as the disclosure of trial strategy to the prosecution or the production of tainted evidence as a result of the alleged interference. *Russum*, 265 Or App at 111. We conclude that defendant has not met that burden. Additionally, even assuming that defendant has shown prejudice, the proper remedy would not be, as defendant contends, a dismissal of the prosecution or reversal of defendant's conviction. Rather, it would be the remedy that the trial court imposed, "the exclusion of any prejudicial evidence obtained as a result of that violation." *State v. Prieto-Rubio*, 359 Or 16, 38, 376 P3d 255 (2016). Thus, we reject defendant's third assignment of error.

In her second assignment of error, defendant contends that the trial court erred in denying her motion for a judgment of acquittal (MJOA), arguing that the state failed to disprove, beyond a reasonable doubt, her defense of self-defense. Defendant asserted that the uncontroverted evidence shows that she was justified in shooting the victim, because she reasonably believed that the victim had a gun and was going to shoot her. *See* ORS 161.209 (A person may use physical force "on another person for self-defense or to defend a third person from what the person reasonably

believes to be the use or imminent use of unlawful physical force, and the person may use a degree of force which the person reasonably believes to be necessary for the purpose"). The trial court denied defendant's MJOA but submitted defendant's defense of self-defense to the jury.

When self-defense is raised by a defendant, the state has the burden of disproving it beyond a reasonable doubt. ORS 161.055(1); *State v. Freeman*, 109 Or App 472, 475-76, 820 P2d 37 (1991). To determine whether the state has met that burden, a factfinder must weigh "(1) whether the defendant reasonably believed that the victim used or threatened to use unlawful physical force against the defendant; and (2) whether the defendant used a degree of force in self-defense that the defendant reasonably believed was necessary." *State v. Poitra*, 261 Or App 818, 820-21, 323 P3d 563 (2014).

The state's burden to disprove self-defense is beyond a reasonable doubt. In other words, to disprove a defendant's theory of self-defense, the state must prove beyond a reasonable doubt that the defendant did not reasonably believe that the victim used or threatened to use unlawful physical force against the defendant and that the defendant did not reasonably believe that the degree of force she used was reasonably necessary. Defendant contends that the trial court should have granted defendant's MJOA, because the state had failed to introduce evidence sufficient to disprove defendant's theory of self-defense beyond a reasonable doubt. The state responds that the evidence was sufficient to prove beyond a reasonable doubt that defendant did not act in self-defense but, rather, planned to murder the victim for financial or other motives and to make it appear that she had acted in self-defense.

In reviewing the trial court's ruling denying defendant's MJOA, we must determine whether, viewing the evidence in the light most favorable to the state and giving the state the benefit of all reasonable inferences and credibility determinations that properly may be drawn, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 341 (1994); *State v. Cervantes*, 319 Or 121, 125,

873 P2d 316 (1994). Under that standard, we conclude that the evidence was sufficient.

The state introduced evidence from which the jury could find that, although the defendant had told people that the victim was abusive and that she was afraid of him, the victim was not abusive, and defendant was not afraid of him; rather, the state produced evidence from which the jury could find that defendant was controlling of the victim. The state produced evidence from which the jury could find that, although defendant denied it to be the case, defendant was concerned about her financial future in view of the victim having filed for divorce.

The state presented evidence from which the jury could find that, although defendant testified that the victim had threatened her with a gun, the victim never held the gun that defendant claimed he had pointed at her, because the victim did not have access to the gun after defendant had disabled the safe lock by removing its batteries; because the gun was found a significant distance from the victim; and because the evidence did not show that the gun had been dropped by the victim onto the floor after he was shot, as defendant asserted.

There was evidence from which the jury could infer that, although a friend had offered to come to the house on the morning of September 23 to be with defendant while the victim was there, defendant had refused because she did not want anyone to be present. There was evidence from which the jury could infer that defendant had not activated the home's surveillance video system on September 23, when the victim was coming to the house, contrary to her usual practice, not because, as defendant testified, she had forgot, but because she did not want the cameras running.

There was forensic evidence that defendant shot the victim three times, once in the abdomen as he walked toward her, once in the thigh as he fell back onto the floor of the bedroom, and once in the heart as she stood over him from a distance of 6 to 30 inches as he was lying on the bedroom floor. There was evidence from which the jury could find that when she shot the victim the third time, defendant

did not, as she testified, reasonably believe that he was pointing a gun at her.

In short, there was evidence from which the jury could reasonably disbelieve defendant's stated reason for shooting the victim as well as her description of the shooting. We conclude that the evidence was sufficient to allow the jury to find beyond a reasonable doubt that defendant did not act in self-defense but in fact murdered the victim pursuant to a plan. We therefore reject defendant's contention in her second assignment of error that the trial court erred in denying her MJOA.

In her first assignment of error, defendant contends that "the trial court erred when it failed to hold a public trial." Defendant's trial was originally scheduled for March 2021. At defendant's request, the court granted a setover to October 2021. Defendant's jury trial was scheduled to begin on October 26, 2021, with jury selection to take place beginning on October 12, 2021. On September 7, 2021, citing "the rapid and extensive spread of the highly contagious Delta variant of the COVID-19 virus," and "a level of crisis not yet seen during the pandemic in Oregon," including record-high statewide hospitalizations, the Chief Justice issued Order No. 21-035, which imposed a requirement for six feet of social distancing in public court rooms. Defendant filed a "Motion for Continuance and Release of Defendant; Alternative Motion for Trial Procedures," asserting that the "prejudicial impacts of COVID-19" warranted a continuance as well as defendant's release from custody. Among other things, defendant contended that the Chief Justice's social distancing order violated the right to a public trial under the Sixth Amendment to the United States Constitution. Defendant also sought to be released from custody, because a continuance would cause a violation of her speedy trial rights. The trial court denied a continuance. And the trial court had made findings under ORS 135.240(2)(a) and Article I, section 14, of the Oregon Constitution, that "proof is evident or the presumption strong" that defendant was guilty of murder and therefore denied defendant's release.

Defendant argued in the alternative that if the trial court would not postpone trial or release her from custody,

the court should implement a number of procedures in the court room, including permitting witnesses and counsel to remove masks when speaking, assuring "that jurors observe the trial together where they can see and hear the same evidence, and be addressed as a group," and that "public access to the gallery in the courtroom be maintained."

The trial court said that it intended to honor the Chief Justice's order. The trial was conducted in compliance with the Chief Justice's order, requiring social distancing of six feet in the court room.[5] But the court consulted with the parties on logistics, and worked with them to accommodate defendant's concerns, including, at defendant's request, not having jurors sit directly behind the parties; using barriers to allow witnesses to testify without masks; and leaving open seats in the gallery for the public. The court also arranged live-streaming of the trial in a room in the court house, so that if seating in the gallery was full, additional members of the public would be able to view the trial in the courthouse, a short distance away.

The record shows that on two occasions during the trial, people had to be turned away from the court room due to a lack of seating capacity in the gallery. The first occasion affected an extra member of the sheriff's office that was present in the court room during the first day of the evidentiary portion of the trial. Defendant raised no objection to that ruling. The second incident occurred on the second day of the evidentiary portion of the trial, when two people who were identified as defendant's friends or family members were not able to obtain seats in the gallery and had to watch the trial at the overflow location. Defendant objected that, at least on that day, there were only two seats available in the gallery for the public, and those seats were taken.

---

[5] The Chief Justice's order defined "social distancing" as "the minimum amount of physical distance between each person. As of the date of this order, pursuant to CDC recommendations the distance is 6 feet between each person."

The Chief Justice's order required application of social distancing in the public areas of court facilities:

"All courts shall require and maintain social distancing in the courtroom and throughout all other court-controlled, public areas of a court facility, unless the Presiding Judge determines that other sufficiently protective measures can be taken and directs that those measures be taken."

The record shows that, as a result of the COVID 19 social distancing requirements, as well as defendant's request for seating of jurors,[6] at times during the proceeding there were only two seats available for spectators in the court room. Citing our opinion in *State v. Jackson*, 178 Or App 233, 236-37, 36 P3d 500 (2001), defendant contends on appeal that the court room procedures imposed pursuant to the Chief Justice's order violated her right to a public trial under the Oregon Constitution, Article I, section 11,[7] and the Sixth Amendment to the United States Constitution.

In determining whether defendant's trial was a public trial within the meaning of the state and federal constitutions, the trial court's explicit and implicit findings of historical fact are binding on appeal to the extent that they are supported by evidence in the record. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968); *State v. Greenwood*, 175 Or App 69, 71-72, 27 P3d 151 (2001), *rev'd on other grounds*, 335 Or 355, 67 P3d 937 (2003) (applying *Ball v. Gladden* standard in Article I, section 11, analysis). The question whether those findings satisfy the constitutional right to a public trial presents an issue of law for the court. *See Jackson*, 178 Or App at 244.

The state has raised questions about whether defendant preserved this particular challenge. We assume for the sake of discussion that the assignment is preserved. But we reject defendant's challenge. Defendant had a public trial. Although seating space for spectators in the court room gallery was limited (in part because of social distancing restrictions and in part because of defendant's requested seating arrangement for the jury), the public was permitted in the court room gallery when seating was available, and the court's remote location allowed the public to view the trial. Additionally, those who were attending remotely could communicate with the court if necessary. Over the course of the three-day trial, spectators could freely attend, either in

---

[6] Defendant objected to having jurors sit behind counsel table, which meant that a row of seating in the courtroom, which otherwise could have accommodated additional public spectators, had to be left empty.

[7] Article I, section 11, provides in part that "[i]n all criminal prosecutions, the accused shall have the right to public trial[.]"

the court room or in the remote location. In short, the public was not excluded from the trial.

The circumstances here are significantly different from those in *Jackson*, 178 Or App at 236-37, on which defendant relies, in which we held that the defendant had been denied a public trial. There, the defendant's trial was held in a prison, in a room that was not open to the public. *Id*. at 244. Here, defendant's trial was held in the courthouse in a public court room. The trial court *Jackson* arranged for a television transmission to a room in the county courthouse, where seating was available for spectators, but a distance away from the prison, and there was no access to the court room where the trial was held. *Id*. at 235. Here, the remote location for spectators who could not sit in the court room was in the courthouse, and spectators could easily walk to the court room to raise concerns with the trial court. We said in *Jackson* that the live television transmission would not accommodate concerns that spectators might have about irregularities in the proceedings—such as jury misconduct or perjury overheard during a recess—because the camera in the courtroom would not capture that type of irregularity. *Id*. at 243. And we said that the location of the trial in the prison impaired the public aspect of a public trial by making it unlikely that a spectator would come forward with surprise evidence. We explained that the prison location might have an adverse effect on witnesses and that the absence of spectators could prevent the defendant and the prosecution from benefiting from the presence of friends and family. *Id*. Finally, we noted that the prosecution had made no "substantial showing of a need" to conduct the trial in the prison. *Id*. at 244.

We are not persuaded that the circumstances of defendant's trial rose to the level of restriction that caused us to determine in *Jackson* that the defendant had less than a "public" trial. But if, and to the extent that it might be concluded that defendant's trial fell short of being "public" because of reduced seating in the gallery as a result of the Chief Justice's order, the record provides a constitutionally sufficient justification for the restrictions that the trial court imposed. *See State v. Bowers*, 58 Or App 1, 4, 646 P2d

1354 (1982) (holding that a defendant has an overriding right to have the state's case against him presented publicly, unless the state makes a substantial showing of a need to limit that right); *see also Jackson*, 178 Or App at 237 (The right to a public trial may be circumscribed if "'the state makes a substantial showing of a need to limit that right.'" (quoting *Bowers*, 58 Or App at 4)). It is undisputed that the social distancing restrictions imposed by the Chief Justice's order were responsive to a public health crisis. Those circumstances provided a substantial showing of need for the trial court's seating restrictions and remote accommodation of overflow spectators. We therefore reject defendant's first assignment of error.

In a counseled supplemental assignment of error, defendant contends that the trial court erred in imposing restitution to the victim's estate of $1,087,466, which the court based on the amount that the assets in the victim's estate would have increased in value over the actuarial 20 years of the victim's life expectancy, had defendant not killed him. Defendant contends that the estimated loss to the value of the estate is a "nonexistent loss," because the assets are currently in the estate, and the victim, who was retired, was not increasing his income but drawing down his assets. Defendant contends that awarding restitution in the amount of the estimated increase in the value of assets that the estate already has in its possession would result in a double benefit and a windfall to the estate's beneficiaries. Because the beneficiaries of the estate will have the benefit of the assets as well as their appreciation, defendant contends that the estate should not also be awarded restitution for the estimated increase in the value of those assets had defendant not killed the victim.

We summarize the applicable law relating to restitution. ORS 137.106 provides in relevant part:

> "When a person is convicted of a crime * * * that has resulted in economic damages, the district attorney shall investigate and present to the court, at the time of sentencing or within 90 days after entry of the judgment, evidence of the nature and amount of the damages. * * * If the court finds from the evidence presented that a victim suffered economic damages, in addition to any other sanction it may

impose, the court shall enter a judgment or supplemental judgment requiring that the defendant pay the victim restitution in a specific amount that equals the full amount of the victim's economic damages as determined by the court."

ORS 137.103(2) states that the term "economic damages" as used in ORS 137.106 "[h]as the meaning given that term in ORS 31.705, except that 'economic damages' does not include future impairment of earning capacity." ORS 31.705(2)(a), in turn, defines "economic damages" as:

"objectively verifiable monetary losses including but not limited to reasonable charges necessarily incurred for medical, hospital, nursing and rehabilitative services and other health care services, burial and memorial expenses, loss of income and past and future impairment of earning capacity, reasonable and necessary expenses incurred for substitute domestic services, recurring loss to an estate, damage to reputation that is economically verifiable, reasonable and necessarily incurred costs due to loss of use of property and reasonable costs incurred for repair or for replacement of damaged property, whichever is less."

"Restitution under ORS 137.106 is informed by principles enunciated in civil cases concerning recoverable economic damages." *State v. Islam*, 359 Or 796, 800, 377 P3d 533 (2016). "Economic damages are the 'objectively verifiable monetary losses' that would be recoverable 'against the defendant in a civil action arising out of the Defendant's criminal activities.'" *State v. Page*, 330 Or App 672, 676, 544 P3d 421 (2024) (quoting *State v. Herfurth*, 283 Or App 149, 153-54, 388 P3d 1104 (2016), *rev den*, 361 Or 350 (2017)).

For purposes of entitlement to restitution, in the case of murder, a "victim" includes the estate of the murder victim. ORS 137.103(4)(e) ("Victim" includes the victim's estate upon the death of the person against whom the defendant committed the criminal offense.). Monetary loss to the victim's estate, referred to as "pecuniary loss to the decedent's estate" under the wrongful death statute, ORS 30.020, is determined according to the principles established in civil cases. *See, e.g.*, *Goheen v. General Motors Corp.*, 263 Or 145, 181, 502 P2d 223 (1972) (discussing evolution of the law in determining pecuniary loss to the estate of a decedent in a wrongful death case). Uniform Civil Jury Instruction 71.02,

on which the state relied in determining pecuniary loss to the estate, provides in relevant part:

> "Pecuniary loss to the decedent's estate is the present value of the increase that would have accumulated in the estate during the remainder of the decedent's life had the decedent's life not ended[.]"

At the time of his death, the victim had considerable assets, including real estate, a retirement account, and investments. The estate retained a forensic economist, who provided an estimate of the additional value to the estate had the victim lived out his life expectancy. The expert calculated the victim's anticipated income from the trust of which he was the sole beneficiary, cash accounts, investments, retirement benefits, and Social Security, as well as the victim's likely consumption of income and assets during his full actuarily determined life expectancy, reduced to present value. Because the victim had filed for divorce from defendant, the expert also estimated a post-divorce division of those assets. Based on that data, the expert estimated the total economic "loss" to the estate, on which the court based its determination that the estate was entitled to recover restitution for economic loss in the amount of $1,087,466.

The underlying value of the assets on which the expert based his calculation is not in dispute, nor is the fact that the assets themselves are in the possession of the estate. What is contested by defendant is whether the basis for determining restitution to an estate in a wrongful death action has any bearing in this case, in which the court determined that restitution could be awarded based on the potential increase in value of the victim's assets in 20 years, had the victim lived, reduced to present value, as well as what the victim would have earned in Social Security.

We agree with defendant that the calculation in determining damages in a wrongful death action cannot be the basis for an award of restitution here. That is because the estate holds the assets and already possesses their potential increase in value. The passive income that the victim could have earned on the assets had defendant not murdered him will inure to the estate, so it is not a loss. The award of restitution would duplicate that value. Because the estate holds

the assets, we conclude that it has not experienced a pecuniary loss for which restitution can be awarded, as required by ORS 137.106.

The record also does not reflect a pecuniary loss with respect to the victim's loss of Social Security benefits. The expert estimated the victim's anticipated Social Security benefits at $34,172 per year. The expert estimated that the victim's personal consumption (his expenses) would have ranged from 34 to 54 percent of his total income of $86,012 (which included pension, investments, and Social Security), or between $29,244 and $46,446 per year, which averages to $37,845.24. That amount exceeds the amount the victim would have received in Social Security benefits and again reflects no net economic loss to the estate. We therefore reverse the supplemental judgment awarding restitution for economic loss in the amount of $1,087,466.

In a *pro se* supplemental brief, defendant raises six assignments of error. We have considered each assignment. As discussed above, we agree with defendant's sixth supplemental assignment of error, in which she challenges the award of restitution. We conclude that the remaining assignments do not raise reversible error.

For those reasons, we affirm the judgment of conviction, and we reverse and remand the supplemental judgment for the trial court to enter a judgment that eliminates the erroneous portion of the restitution award.

Supplemental judgment reversed and remanded for entry of judgment omitting restitution award of $1,087,466; otherwise affirmed.